Carolyn **BRADLEY** et al.

v.

**SCHOOL BOARD OF the CITY OF RICHMOND, VIRGINIA,** et al.

Civ. A. No. 3353.

United States District Court,
E. D. Virginia,
Richmond Division.

Aug. 17, 1970.

Ralph Page, Richmond, Va., Jack Greenberg, James M. Nabrit, III, Norman J. Chachkin, New York City, James R. Olphin, Richmond, Va., Louis R. Lucas, Memphis, Tenn., for plaintiffs.

George B. Little, William L. Wimbish, Conard B. Mattox, Jr., Richmond, Va., for defendants.

Everette G. Allen, Jr., Richmond, Va., for intervenors Bellevue-Ginter Area Civic Ass'n, Robert Douglas Bain, and Sherwood Park Civic Ass'n.

Frederick T. Gray, Walter E. Rogers, Richmond, Va., for intervenors Noel Austin and others.

John S. Battle, William H. King, Jr., Richmond, Va., for intervenors Westover Hills Parent-Teacher Ass'n.

## MEMORANDUM

MERHIGE, District Judge.

This class action, a school desegregation case, has been before the Court in one posture or another for about nine years.

It was commenced approximately seven years after the historic *Brown* decision, Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and reached what was then hopefully considered the end of the road by virtue of a Court approved plan for the desegregation of the Richmond City school system by utilization of "freedom of choice."

In the interim, as in many similar suits, the matter had gone to and from the United States Court of Appeals for the Fourth Circuit and the United States Supreme Court.

On March 10, 1970, the plaintiffs filed a motion for further relief, based upon the mandates of our appellate courts requiring school boards to put into effect school plans which would promptly and realistically convert public school systems into ones which were unitary, nonracial systems, removing all vestiges of racial segregation.

On March 12, 1970, the Court ordered the defendants to " * * * within ten days from this date, advise the Court if it is their position that the public schools of the City of Richmond, Virginia, are being operated in accordance with the constitutional requirements to operate unitary schools as enunciated by the United States Supreme Court."

On March 19, 1970, defendants filed a statement to the effect that "they had been advised that the public schools of the City of Richmond are not being operated as unitary schools in accordance with the most recent enunciations of the Supreme Court of the United States," and further that they had "requested the Department of Health, Education and Welfare to make a study and recommendation as to a plan which would ensure the operation of a unitary school system in compliance with decisions of the United States Supreme Court," said plan to be ready by May 1, 1970.

A pre-trial conference was held in open court on March 31, 1970, at which time the Court having some doubt as to the effect or intent of the defendants' statement of March 19, 1970, "that they had been advised that the public schools of the City of Richmond are not being operated as unitary schools in accordance with the most recent enunciations of the Supreme Court of the United States," inquired as to whether defendants were desirous of an evidentiary hearing as to the plan they were then operating under, i. e. freedom of choice.

The defendant school board, by counsel, advised the Court that such a hearing would not be necessary and admitted that their freedom of choice plan, although operating in accord with this Court's order of March 30, 1966, was operating in a manner contrary to constitutional requirements.

As a consequence thereof, the Court on April 1, 1970, entered a formal order vacating its previous order of March 30, 1966, and mandatorily enjoining the defendants to disestablish the existing dual system of schools and to replace same with a unitary system, the components of which are not identifiable as either "white" or "Negro" schools.

The defendant school board was directed to file its proposed plan by May 11, 1970. Plaintiffs were to file exceptions by June 8, 1970, and hearings were set for June 19, 1970.

On or about June 4, 1970, the first of the eventual intervenors moved to intervene.

In the interim, the school board had filed its proposed plan, which had been prepared by the Department of Health, Education and Welfare.

The Court heard and considered the motions to intervene and permitted all who so moved to intervene, pursuant to Fed.Rules Civ.Proc. rule 24(b), 28 U.S.C.

The intervenors were as follows:

1. Bellevue-Ginter Area Civic Association, described as a non-profit corporation composed of "residents of the City of Richmond, most of whom have children in the Richmond public school system and all of whom are deeply and sincerely interested in maintaining the finest possible public school system, in maintaining the 'Northside' area of Richmond as a desirable area to live and raise children of school age and in preventing 'tipping the neighborhood' by causing responsible residents to leave the area." The area in which these intervenors reside is generally considered an integrated one.

2. Robert Douglas Bain, an infant, et al. and Sherwood Park Civic Association. The individuals are white residents of the Northside of the City, as are the members of the Civic Association, all of whose interest coincides with the interest of the first named intervenors, Bellevue-Ginter Area Civic Association.

3. Noel Austin, et al. described as residents of the City of Richmond (both infant and adult) residing in that area of the city recently annexed from the contiguous County of Chesterfield. (The area described as being recently annexed is predominantly white.)

4. Westover Hills Parent-Teachers Association, described as an association of teachers and parents of children assigned to and attending Westover Hills Elementary School. (A predominantly white school—99.43% under freedom of choice—located on the Southside of the City.)

Exceptions to the H.E.W. plan were filed by the plaintiffs and those intervenors described as Northside residents.

The Westover Hills P.T.A., while not filing any formal exceptions, did in its pleading upon its application to intervene address itself to the H.E.W. proposal to eliminate the 7th Grade level at Westover Hills Elementary School.

On June 11, 1970, one week prior to the original hearing on the H.E.W. plan, and approximately three months after the defendant school board stated it had been advised its freedom of choice plan had not brought about a unitary system, the Northside intervenors in a pleading styled "Bellevue-Ginter Area Civic Association Amended Pleading and Pleading on Behalf of Other Intervenors," requested the Court to vacate its order of April 1, 1970, (this order, in essence, recited the school board's admission that its system did not conform to the Constitutional requirements and ordered the submission of a plan other than freedom of choice) or to require the taking of evidence to rule upon the constitutionality of said plan in its entirety or in part.

It should be noted here that the Court had permitted intervention upon the conditions that the intervention would in no manner delay the case and that the intervenors take the case in the posture it was at the time of intervention.

The Court, as will be pointed out in more detail in this memorandum, is satisfied that the defendant school board's admission in reference to this issue was demonstrably justified.

In any event, no evidence was received in support of any theory that the school board's court-approved freedom of choice plan had worked.

The Northside intervenors and plaintiffs filed proposed plans of their own.

Intervenors' plan was confined as to specifics to approximately ten schools and included a suggestion that *"Free transfer* should be implemented as part of any plan, but for the sole purpose of allowing transfers *from* the racially identifiable schools to an integrated school, where space is available at the latter. Further, some transfer policy should be available where the reason for the transfer is justified by valid educational reasons. For example, if a math center is established at John Marshall High School, a student with interest and ability in math might be permitted to transfer from Maggie Walker, Thomas Jefferson or any other high school to John Marshall, assuming space is available."

The hearing on all proposed plans and exceptions thereto was commenced on June 19, 1970, and concluded on June 26, 1970, at which time the Court, recognizing the necessity for expeditious rulings and intending to file these more detailed findings of fact and conclusions of law, advised the defendant school board that its proposed H.E.W. plan was not acceptable—a conclusion which the Court felt then and still feels should have been patently obvious in view of the opinion of the United States Court of Appeals for the Fourth Circuit in Swann v. Charlotte-Mecklenburg

Board of Education, 431 F.2d (4th Cir. 1970), which had been rendered on May 26, 1970.

The fact that the defendant school board took no voluntary action to change its court-approved freedom of choice plan even after the United States Supreme Court's widely disseminated opinion in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), coupled with its continued presentation of the H.E.W. plan during the June hearings, coupled with the Court's ultimate findings of fact, convinces the Court that no plan can be approved that is not of a reasonably definitive nature in every aspect.

## STUDENT POPULATION BY RACE UNDER FREEDOM OF CHOICE IN EFFECT 1969-70

As of May 1, 1970, the Richmond public school system enrolled approximately 52,000 students. The racial composition of the school student population was roughly 60% Black and 40% White. The board operated 61 school facilities.

### High Schools

Of the seven high schools, three were 100% Black; one was 99.26% White; one was 92% White; one 81% White and one 68% Black, the latter being John Marshall located on the Northside of the City.

### Middle Schools

Of the middle schools, three were over 99.91% Black (99.92%, 100%, 100%); one was 88% Black; one 73% Black; three were over 91% White (91%, 97%, 98%), and one was 69% Black.

### Elementary Schools

Seventeen elementary schools were 100% Black; four others were in excess of 99.29% Black; one was 78% Black; one was 37% Black; and another was 30% Black.

Two schools were 100% White; thirteen others were 90% or better White; two others were 86% or better White; five others were between 53% and 70% White.

As to the twelve schools with special programs, two were 100% Black; one was 92% Black; one was 83% Black; two others 60% or better Black; four schools had White students ranging from 78% to 100%; two others were 53% or better White.

### Faculty & Staff

Out of a total faculty and staff of 2,501, excluding special program schools,

4 had 100% White faculty and staff;
13 had 100% Black faculty and staff;
16 others had 90% or better White faculty and staff;
12 others had 90% or better Black faculty and staff;
8 others had 80% or better White faculty and staff;
4 others had 80% or better Black faculty and staff.

### Faculty and Staff by Area

| | |
|---|---|
| East End side of City | 92.2% Black – 7.8% White |
| Southside area | 30% Black – 70% White |
| Annexed Area | 2.5% Black – 97.5% White |
| West End – Northside | 50.6% Black – 49.4% White |

————◆————

There is little doubt that under freedom of choice Richmond public schools had not achieved a unitary system as required by law—see Green v. County School Board of New Kent, *supra*. In 1965 the defendant school board

was directed to desegregate the faculties and staffs of the public schools, Bradley v. School Board of City of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965); yet out of a total of 658 faculty and staff members in the East End area schools, 607 were Black and 51 White; in the Southside area schools, 108 were Black and 252 were White; in the West End-Northside area schools, 459 were Black and 448 were White (even there the assignment of faculty and staff was such as to create in the separate schools disparities ranging from 57.1% White and 42.9% Black in one school to other schools in which there were either 100% Black or 100% White).

That the respective Richmond public schools with rare exception, were as to student population and staff readily identifiable as either Black or White schools is too obvious to warrant any further discussion. The defendant school board's admission in this regard was well warranted, and the Court so finds.

The answers to interrogatories show conclusively that there was generally little change in the racial composition of the schools from the inception of the freedom of choice plan to the present.

Under the circumstances there can be no doubt but that the plaintiffs' motion for further relief was well founded.

### De Jure Segregation

The City of Richmond's present pattern of residential housing contains well defined Black and White areas, which undoubtedly is a reflection of past racial discrimination contributed in part by local, state and federal government.

The City of Richmond has itself described the residential pattern of development as being one in which there has been "a total isolation and segregation of the Negro".

Schools have been built on land in which the deeds contain restrictive covenants precluding the use of property by any other than those of the Caucasian race.

Seven years after the *Brown* decision the officials of the city, the school board and the Richmond Redevelopment and Housing Authority were describing schools as Black or White.

Urban renewal sites have generally been selected in well defined Negro residential areas; urban renewal is to a great extent sponsored by agencies of the Federal Government. Local housing authorities or urban renewal authorities such as the Richmond Redevelopment Authority present their proposals to the United States Department of Housing and Urban Development, who in turn review the proposals to ascertain whether they meet federal criteria for funding purposes.

Prior to 1964 public housing projects were built in consideration of racial character and the ultimate uses thereof. They were built for either black or white occupancy. In Richmond they have been established according to racial identity. Between the passage of Title VI of the 1964 Civil Rights Act and 1967, tenants' selection policy could be generally characterized as a freedom of choice, and there was little change in racial character of occupancy of public housing projects.

There is a direct relationship between the selection of sites for public housing projects and the selection of sites for public schools.

Racially segregated housing patterns have resulted to a great extent in limiting options available to black persons to occupy such housing.

The Blacks have generally been "locked in" so to speak, by the additional factor that for a substantial portion of the time in which Federal Housing Administration operated separately from the Department of Housing and Urban Development, of which it is now a part, its policy was to refuse to insure home loans in those areas which were not racially homogeneous.

Statutes such as we had in Virginia (and in other states, many outside the South), which required racial segrega-

tion in housing and schools, as well as restrictive covenants limiting the use and occupancy of land and dwellings to members of the Caucasian race, have long term effects which are not and have not diminished by the lifting of such restrictions. Indeed, even now, some 22 years after the outlawing of restrictive covenants, and years after the outlawing of discriminatory statutes and ordinances in Virginia, the facts are that there are only a few areas in the City of Richmond which are considered ones of a transitional nature.

As pointed out by Chief Judge Hoffman of this District in his memorandum opinion in Beckett v. School Board of City of Norfolk et al., 308 F. Supp. 1274 (1970), the result of segregation, whether *de jure*, i. e.—forced, purposeful separation of races created by law, or *de facto*, which rarely if ever did not in some manner have its inception or at least encouragement by official actions, is still the same.

That private discriminatory actions have made their contribution to the racially segregated housing patterns in Richmond is evidenced by the fact that most subdivision deeds in the area contain racially restrictive covenants. Only four years ago the City purchased land for use by the school board the deed to which contained a racially restrictive covenant. Racially restrictive covenants were included by Lawyers Title Company in abstracts in the city right up to 1969.

The City of Richmond has always permitted higher population densities in black areas than in its white areas.

Properties available for sale to Negroes are listed in the larger local newspapers in a general "for sale" category as distinguished from a reference to zones designating geographical location as shown by a small map in the classified sections.

Knowledgeable people in the field of real estate are reasonably certain, or as expressed by one expert in the field "could probably guess, with good certainty, the racial acceptability, if you want to use that word, from almost any ad in the paper." As late as June 23, 1970, there were ads in the local newspapers stating at least two properties were available for sale to. "anyone."

While the requirements for membership in the Richmond Board of Realtors, a private group of real estate brokers, have no relation to race, there has been and still may be, according to uncontradicted testimony, a clause in the code of ethics of the realtors to the effect that one could not disturb the white community by selling property therein to blacks, although certain areas of the city would be offered to non-whites by all realtors once the board of realtors determined that an area was one of transition and a home had been sold to Blacks in a particular block, and that block was determined by the board to have been "broken."

Defendants' Exhibit 18 graphically shows that black areas are generally in the inner city and transition areas are without exception immediately contiguous to the already existing black areas.

The combination of public and private discrimination which has been inflicted upon the Negroes is perhaps best described in the Model Neighborhood Planning Grant application made by the City of Richmond to the Department of Housing and Urban Development as recently as two years ago. In describing the virtually all Negro population of the area for which the application was made the City stated, "The racial profile of the Model Neighborhood does not provide an ethnic mix which is representative of total city population, but reflects the total isolation and segregation of the Negro within the city's residential pattern of development;" and later in the same application the City stated, "Community neglect of education is illustrated by the fact that only two of the eight schools in the Model Neighborhood area are less than ten years old, the other six are over thirty years old;" and still further, "Children do not read and spell correctly. Dropout rate in the schools is too high. Children are not able to speak correctly.

Racial discrimination and segregation is visible."

In the same application in reference to housing the city stated, "Availability of housing is limited because of the pattern of racial segregation in the community;" and still further, "Many Negroes with the ability to pay for better housing are confined * * * by social constraints;" and "Housing available to Negroes in Richmond is limited as in most major United States cities by racial discrimination in the sale and rental of housing;" and "Discrimination tends to polarize the Negro population into confined areas * * *." The same application stated, "As a rule, the Negro schools are older and occupy smaller sites than the white schools."

■ The foregoing descriptive comments made in the city's formal application to an agency of the Federal Government is well borne out by the evidence before this Court, and is illustrative of the Court's factual conclusion that any school plan must, if a truly unitary system is to be achieved, result in the assignment of students in some manner other than by a strict concept of neighborhood schools, for as desirable as they may be to all they cannot effectuate a unitary system of schools in the City of Richmond.

■ While the Court sees little practical distinction between "*de jure*" as opposed to "*de facto*" segregation, it is patently obvious that, as a practical consequence of the factors which have created the separation of Whites from Blacks in their residential patterns, school boards in cites such sa Richmond are burdened with a monumental task in establishing a truly unitary school system; all of this as a result of a myriad of conditions and circumstances for which they are not in whole responsible. Nevertheless, the burden is theirs to assign students in such a manner as to bring about the elimination of the dual school system.

The time for all deliberate speed has run out. Our appellate courts—both the United States Supreme Court and the United States Circuit Court of Appeals for the Fourth Circuit—have decreed that the burden is on the school boards to create a unitary system of public schools—now.

## H.E.W. PLAN

Pursuant to this Court's order of April 1, 1970, directed to the defendant school board, to create a unitary system of schools, the board for all practical purposes referred the matter to the Division of Equal Educational Opportunities, associated with the United States Office of Education, Department of Health, Education and Welfare.

A team from that division, headed by a program officer, commenced the preparation of a plan for the operation of the public schools of Richmond and presented their suggested plan to the school board on April 30, 1970. The board approved the plan as submitted, with a minor change concerning the incoming senior classes of the respective high schools in the system, and a change as to suggested faculty assignment. The board's plan did not, as suggested by H.E.W., propose to assign teachers and staff so as to approximate, at each facility, the ratio of Black to White teachers in the system as a whole. The board amended that portion of the H.E.W. plan to provide that assignments of teaching and other personnel would be made so as to provide "substantial integration of same," which was interpreted by the board to mean a 20% variance on either side of the actual system-wide ratio.

The H.E.W. team secured information from the school administration as to building capacities, enrollments, condition of the school buildings, acreage of the building playgrounds, etc. Each school in the system was visited by groups of two members of the team. Interestingly enough, no detailed transportation information was requested by the team of the school administration, nor was any furnished to them. The evidence disclosed that the H.E.W. team never conferred with the school board. Although it was aware that some limited

bus transportation was provided by the school board, and that there was an existing public transportation network, no consideration was given to same by H.E.W. by reason of the fact that by unwritten H.E.W. policy, which apparently was then in effect, transportation resources which could be utilized by a school board were not to be considered and, obviously, since no detailed transportation information was requested or furnished to the H.E.W. people, none was considered.

While the H.E.W. team presumably drafted a plan to desegregate the existing dual system and to provide for a unitary school system with "as much integration, desegregation as possible", to quote the witness who testified that he was in charge of the development of the plan, amazingly enough no consideration was given as to the race of the children whom they sought to assign to the school facilities. Unfortunately the primary purpose of the H.E.W. team was to attempt to implement what they considered to be H.E.W. policies as distinguished from disestablishing a dual system of schools. Their task, if in fact approached as testified to, was literally an impossible one. How one can disestablish a dual system of schools without giving any consideration whatsoever to the racial composition of the student population to be assigned under a proposed plan escapes this Court's logic.

■ If public school systems are duty bound to refrain from practicing segregation and to eliminate already existing segregation, then an impossible task would be put upon them to demand the elimination of already existing segregated school systems and impose upon them the burden of doing nothing to eliminate same. A board must be free to undo arrangements or an operation of a school system which has resulted in the maintenance of segregated schools, and in their efforts to do so they are not prohibited from considering race.

The H.E.W. plan was basically a zoning plan, with some clustering of schools. In setting the zones for the various schools, the drafters of the plan considered the capacity of the school buildings, the proximity of the buildings to the pupil population, and factors such as the safety hazards on the immediate approaches to the schools in relation to where the pupils lived. The plan was, in essence, a neighborhood school plan— a plan which under certain circumstances undoubtedly would be commendable. By reason of the residential patterns in the City of Richmond, however, wherein there are with rare exceptions distinct White areas and distinct Black areas, a true neighborhood school plan of necessity can result only in a system in which there are Black schools and White schools and not just schools.

In fairness to the team which developed the suggested plan which was ultimately submitted by the school board, it must be said that they were limited by H.E.W. policy in the types of remedies which they might consider.

As the Court has already stated and found as a fact, Negroes in Richmond live where they do because they have no choice. Housing is generally not available in other areas of the city.

■ While obviously a racial balance is not required to effectuate a unitary school system, the plan submitted through H.E.W. is incapable of creating a unitary school system. The racial identities of the schools will be readily discernible.

■ In the East End of the city, schools therein would be composed of the following:

4 schools would be 100% Black
9 schools would be between 93 and 99.65% Black
1 school would be 88% Black
1 school would be 68% Black
1 school would be 64% Black

Included in the 16 schools aforementioned are two high schools, one of which would have a 96% Black student population and the other 88% Black student population.

In the Southside area of the city the percentages would be as follows:

1 school would be 58% White
1 school would be 59% White
1 school would be 72% White
1 school would be 74% White
1 school would be 84% White
1 school (the Senior High School) would be 72% White

In the West End and Northside of the city, the percentages generally would be as follows; with a total of 19 schools (8 schools being paired) the three high schools would be as follows:

1 school would be 91% Black
1 school would be 72% Black
1 school would be 72% White

and of the elementary and middle schools:

3 schools would be 100% Black
1 school would be 97% Black
1 school would be 96% Black
1 school would be 92% Black
1 school would be 80% Black
1 school would be 64% Black
1 school would be 61% Black
1 school would be 54% Black
1 school would be 51% Black
1 school would be 83% White
2 schools would be 80% White
1 school would be 72% White
1 school would be 60% White

It is patently obvious that the majority of those schools, as in the East End, are readily identifiable as either a Black or a White school.

In the newly annexed area of the city, an area which is almost all White, under the proposed H.E.W. plan the percentages would be as follows:

1 school (the high school) would be 99.26% White
2 schools would be 100% White
6 schools would be between 95–98% White
1 school would be 89% White

As a consequence, each of the schools is readily identifiable as being a White school.

The Court concludes, as stated from the bench, that under the legal principles by which this Court is bound, the H.E.W. plan submitted by the school board will neither now create a unitary school system in the City of Richmond, nor is there any hope that same will come about in the future by use of that plan. Any reasonably substantially mixed racial attendance which would be effected at a few schools would not be sufficient to transform the system into a unitary one.

■ While the student population, as heretofore mentioned, is 60% Black and 40% White throughout the city, the plaintiffs have not suggested nor has the Court attempted to evaluate either the H.E.W. plan or the subsequent plan filed by the school board in the light of requiring any such exact balance. Unquestionably, as heretofore stated, racial balance in each school is not, as this Court interprets the law, required. The burden is upon the school board to erase the racial identity of schools, and this the H.E.W. plan has failed to do.

It should be pointed out, as the Court pointed out from the bench, that while the witness who was in charge of the preparation of the H.E.W. plan stated that same was drafted without any consideration of race, in one instance 45 White students would have been assigned to a school with 965 Black students, although the White students did not reside in an area which the H.E.W. team at first considered to be in that elusive zone described as a neighborhood school zone when they first drew their zones. According to the witness, that was done for the sole purpose of placing some White students in a school with Black students, which resulted not in an integrated school, nor even a facet of a reasonably unitary school system, but in just plain "sprinkling."

Accepting the testimony offered by the school board in support of the H.E.W. plan in a literal fashion, the Court finds that (1) no consideration was given to race in the preparation of the plan—a theory which has long passed on; and (2) the plan was drawn in spite of the awareness of the school board of the pat-

tern of residential segregation within the City of Richmond. Those methods which a school board is bound to consider to bring about a desegregated school system, as required in this Circuit under the principles of our appellate rulings, were to a great extent ignored.

It becomes even more constitutionally impermissible when one considers that the only conceivable effect of the zoning suggested by the school board on the basis of the H.E.W. plan would be to continue the past discriminatory assignment policies. If neighborhood schools in the true sense are permissible in a situation wherein the use of same not only fails to achieve any degree of dismantling of an already existing dual system but perpetuates one of the very evils which *Brown I* stated had to be alleviated, then almost twenty years of resistance to the law of the land has indeed effectuated a change in the law without benefit of resort to the procedures contemplated under our system in effectuating any such change.

The cases are legion in which the courts have consistently stated that regardless of the method used by a school board, whether it be freedom of choice, geographic zoning, pairing, or any other method, they may not continue the operation of a dual system of schools.

Whereas, as heretofore pointed out by the Court, all of the difficulties which this Court now faces were not in whole created by the actions of the school board alone, it is patently obvious that school construction and faculty assignments, coupled with all of the other discriminatory practices engaged in and encouraged by local, state and federal agencies, as well as private discriminatory practices, require that the plan submitted be disapproved by this Court on the ground that, while the assignment of pupils to neighborhood schools is undoubtedly both a sound and desirable concept, it cannot in this Circuit be approved if residence in a neighborhood is denied to Negro pupils solely on the ground of color, as this Court has found.

Unfortunately it would appear that in spite of the lifting of public discriminatory practices as a result of the repeal of White supremacy laws, congressional action and judicial pronouncements, no real hope for the dismantling of dual school systems appears to be in the offing unless and until there is a dismantling of the all Black residential areas.

■ Accepting the H.E.W. witness as having correctly expressed the policy of the executive branch, and as reluctant as this Court is to be critical of same, the Court is duty bound, consistent with constitutional requirements, to comply with appellate court opinions delineating those constitutional requirements.

### The City of Richmond and Annexation

The City of Richmond is surrounded on all sides either by Chesterfield or Henrico County. On January 1, 1970, under an order of annexation entered in the Circuit Court of Chesterfield County, the City of Richmond was granted certain territories of Chesterfield County.

The exhibits before this Court indicate that during the trial of that litigation it was represented by the City of Richmond that the entire area of the present city limits (including the area that was successfully annexed) is anticipated to be within a 30 minute maximum in travel time for one going into or out of the center of the city.

■ As a consequence of that annexation, it is common knowledge that it was estimated that there were brought into the city limits approximately 40,000 additional residents, and it was estimated during that trial, which was not concluded until July of 1969, that prior to the annexation the city of Richmond was composed of approximately 218,000 persons. Included in the newly acquired citizens of Richmond was a school population of approximately 8,135 students (it was anticipated that this would be the number from the annexed area attending Richmond schools commencing in September 1970). Of that total student population, 97.5% were of the White

race and 2.5% (206) were Black. Therefore the Court concludes that the racial composition of the newly acquired territory is overwhelmingly White.

The annexation decree provided that there would be turned over to the City of Richmond upon payment of certain sums thirteen school properties. Those buildings, which the city acquired from the county, would not have sufficient space to take care of all the student population living within the annexed area, there being 3,000 more students than there was building space, and it was agreed that the Richmond school board would provide transportation for children in the annexed area until such time as public transportation becomes available. The agreement provided that Chesterfield County would take care of the excess students at the elementary level until September of 1971, and the excess secondary students until September of 1972.

The Court decree itself, which granted to Richmond approximately 23 square miles, provided that the City of Richmond would construct the necessary schools to serve the annexed area at an estimated cost of fifteen million dollars, which included reimbursement to the Chesterfield County school board for its costs in the construction of three elementary schools for which the Chesterfield County school board was to acquire sites approved by the city at prices to be approved by the city, and was to undertake to build the three elementary schools aforementioned to city specifications and design as directed by an architect selected by the city at contract prices approved by the city. In this connection, the sites have been acquired although no construction has been commenced by reason of an injunction entered by this Court.

 The Court finds that the site selection for the elementary schools was made without consideration of the city's being required to effectuate a unitary school system. As one witness stated, most of the work in connection with that aspect of what apparently was a consent decree " * * * was done in one

night down at the Chesterfield Courthouse."

 The burden is on the school board to show that any new construction will effectuate and assist in the establishment of a unitary system as distinguished from hindering same.

In addition, the annexation court decree provided that the Chesterfield County school board would provide space and instruction on a tuition basis for all school children in the annexation area for whom the City was unable to so provide during 1969–70 and is unable to provide in the 1970–71 session. As to the junior and senior high school students in the area, under the same arrangement Chesterfield County school board was to provide space and instruction for that category of student for whom the City was unable to provide in the 1971–72 session.

The school board has in the past reserved sites for schools which they have not put to use. It may well be that in view of this proceeding, the defendants may wish to re-examine their prospective construction programs, especially in view of the fact that it is anticipated that when school buildings are constructed they will be in use for approximately 50 years.

Of the school properties operated by the defendant school board, 28 have been constructed for over 50 years and one has been in use since 1881.

At a post evidentiary conference between the Court and counsel for all parties, it was represented by the attorney for the defendant school board that study has been given to complying with a master plan of land use, community facilities, and traffic of the City of Richmond, as adopted in 1964, having to do with the proposed abandonment of the Bellevue and Bowler schools. In addition apparently, from the representations made, there have been some recommendations to abandon at least three other schools and the partial abandonment of three more. Most of the schools that apparently are under consideration in this

regard are located in Negro residential areas of the city. The Court makes reference to counsel's reference at the post-trial conference simply to point out the importance of the defendant school board's adopting or complying with a plan for the operation of unitary schools as quickly as possible, and certainly by no later than the year 1971.

If it is reasonable, as the Court finds, for the Court not to require that the defendants forthwith adopt the plan suggested by Dr. Foster or a similar one, which undoubtedly would require transportation to be made available, but to require that the school board take the necessary steps to adopt such a plan to be put into effect as early as possible, bearing in mind that the board must make its own conclusions as to whether or not to operate its own transportation system as the Court finds would be reasonable, and assuming arguendo that defendants' much repeated argument to the effect that no precipitous action ought to be taken until there is a more definitive ruling by the appellate courts, it follows that it is just as reasonable for the school board not to take any precipitous steps in the expenditure of large sums of money for construction until such definitive appellate rulings as they seem to anticipate.

### Plaintiffs' Proposed Plan of Desegregation

The plaintiffs utilized the services of Dr. Gordon Foster, an expert in school administration and in school desegregation planning. He is presently associated with the School of Education at the University of Miami, Florida, and is a director of the Florida School Desegregation Consulting Center at that University, a center funded through the Department of Health, Education and Welfare.

Through Dr. Foster the plaintiffs proposed a plan described below, which the Court finds would result in a unitary system.

The plan, briefly stated, is one in which the techniques of contiguous zoning and pairing, satellite zoning and non-contiguous pairing together with the use of public transportation and that of the school system, were all incorporated.

Plaintiffs propose that all elementary schools be capable of accommodating students in grades K through 6, hopefully by pairing. Some schools would have kindergartens and grades 1–3, while others would have grades 4–6, generally speaking. The proposed plan neither sought nor resulted in racial balance at each school, the student bodies at the respective schools ranging from a black population of 39.2% to 71.8%, although most schools ranged between 50 and 65%.

Dr. Foster, in preparing the plan, studied the proposed H.E.W. plan and the maps accompanying same, spot maps, depositions, certain of the exhibits, as well as the existing transit routes operated by V. T. C. In addition he visited the site of each school in the system. Dr. Foster relied upon his own count of pupil locater spot maps and attempted to utilize the methods of zoning, pairing, clustering, and then proceeded to take into account transportation. All of the techniques used by Dr. Foster have been used by school systems not only in preparing desegregation plans, but by reason of building capacity for utilization of facilities. In addition, Dr. Foster recommended the closing of Arents Elementary School, on the grounds that it was old with very little property surrounding it and was extremely close to the Clark Springs School which had ample space for the Arents School population.

By way of comparison with the H.E.W. plan, Dr. Foster recommended the pairing of certain of the schools which had been paired under the H.E.W. plan. It appears that Dr. Foster recommended changes in the zones in most instances from the zones contemplated by the H.E.W. plan. Reference is herewith made to pages 11 through 77 of the defendants' Exhibit 1, copies of which are attached hereto and designated by the Court as "H.E.W. Proposed Plan," along with changes recommended in said plan by the plaintiffs' expert and designated by the

Court as "Plaintiffs' Proposed Plan," along with pupil enrollment projections under said proposed plan, all designated as "Appendix B" attached hereto.

Plaintiffs' suggested plan results in the contiguous zoning of certain of the elementary schools in the central Richmond area north of the James River. Some schools were contiguously paired and 26 schools were arranged in 13 non-contiguous pairs. The junior high school plan as proposed created non-contiguous pairing, and it was suggested by Dr. Foster that while it was educationally sound and in his and the Court's opinion an improvement over the H.E.W. plan, he frankly stated that he felt with more time his proposed junior high school plan could be improved upon. It is to be noted that under the plaintiffs' proposed plan all high schools in the system serve grades 9 through 12, although Binford and Blackwell Junior High Schools also house a total of 808 9th grade students. As shown by the overlays accompanying plaintiffs' proposed plan of desegregation, contiguous zones have been preserved, some of which include areas on both sides of the James River. The high schools have been zoned as demonstrated by the overlay accompanying said plan.

As is readily seen, plaintiffs' proposed plan would require transportation to be available for approximately 15,280 students. A more detailed analysis of the transportation needs required under the plaintiffs' proposed plan and that which may be required under the defendant school board's second plan is made in the next section of this memorandum, styled "Transportation."

*Transportation*

Each public school within the city system (excepting certain of those in the newly annexed area) is serviced by a Virginia Transit Company bus route. In addition to its regular routes during the school year 1969–70, the Virginia Transit Company operated certain special school bus routes planned in conjunction with school officials for servicing particular schools. Pursuant to its franchise agreement with the City of Richmond, school children have in the past been carried by Virginia Transit Company buses at a special rate of 10¢ each way, as contrasted with the regular fare of 25¢. School bus tickets are sold in books of 20, and these tickets are sold at some school locations as well as at commercial locations near the schools.

Special bus service has been provided by V.T.C. for at least seven years. Based on V.T.C.s' records, at least 10,800 rides were afforded school children daily during the past school year, a figure representing 5,400 students going to and from school each school day. In addition, some students undoubtedly utilized the bus service by payment of the regular fare. In addition to the 5,400 aforementioned, approximately 5,000 more children were bused to school in the area recently annexed by the City of Richmond during the past school year. The school board operated on its own nineteen buses which were used during the 1969–70 school year, the majority of them being used by specially classified students and some as school buses for regular students. The 5,000 children aforementioned who were bused to school in the annexed area during 1969–70 attended schools which were operated by the Chesterfield County school system during the second semester of 1969–70 school year, the Richmond school board having paid tuition to the Chesterfield school system for these pupils.

The school board also has purchased 63 new school buses for the transportation of students in the annexed area in accordance with the terms of the annexation agreement.

There is nothing special about the utilization of buses in connection with the Richmond school system. For years school buses have taken students across the James River to classes while the schools were operated in a segregated manner. In the last school year students rode regular V.T.C. service routes across the James River to schools. While the Virginia Transit Company buses all display signs reading "Caution—School

Children," their buses are not the conventional yellow school bus and hence do not meet the required standards of the Virginia State Department of Education in order to be classified as school buses under laws, concerning eligibility for reimbursement for operating costs.

It may be appropriate at this point to refer to the fact that V.T.S. is not presently in a firm financial position, and it is reasonable to assume that some increase in rates affecting school children may be forthcoming.

The Commonwealth of Virginia financially assists only county or city operated school bus systems which conform to certain regulations. Briefly, the legislature of Virginia appropriates a lump sum of money. This money is distributed according to a formula that the State Board of Education has adopted and actually amounts to a division of the funds on the basis of 40% for pupils transported in the previous year, 40% for miles the bus has traveled the previous year, and 20% for buses in use during the current year. The appropriations made by the legislature of Virginia for the past school year in assisting localities to defray the cost of transporting students was $9,140,460.00.

Over 60% of the students attending public schools in Virginia were transported on school buses as defined by the State Board of Education. The operating cost per student in those cities operating school buses throughout the state averaged $23.02 for the year 1968–69. This represented an average of 122 students per each bus operated.

The State Board of Education offers to all school systems, both city and county, their facilities and assistance in preparing school bus routes.

As an example of the use to which transportation is utilized throughout the state of Virginia, Henrico County and Chesterfield County, both of which are contiguous to the City of Richmond, respectively transported 21,945 students of which 12,673 were elementary students, and 23,229 students of which 15,623 were elementary students, during the school year 1968–69.

The operating cost per student for counties during that year was $30.61, based on an average of 87 students per bus. The average cost of operating a school bus in Virginia during the school year 1968–69 for cities was $2,814.00, for which the cities were reimbursed by the state sums approximating half of these operative costs.

School boards may, under Virginia law, provide for the transportation of pupils. Over half a million students were transported throughout the state of Virginia during the school year 1968–69. During the school year 1968–69 the average number of pupils transported per bus in the cities of Virginia was 122; the average miles per bus per day was 42—ranging from 18 to 90 miles. In order to be eligible for state financial assistance, a bus must travel a minimum of 16 miles per school day. Statistics show that children transported on school buses are safer than those who travel on foot.

During the 1968–69 school year approximately 18½ million school children were bused to school each day in the United States.

The 63 66-passenger capacity school buses heretofore referred to as having been purchased by the school board for use in transporting children in the newly annexed area were purchased at a cost of $7,500.00 per bus.

Were the system for the operation of schools in the City of Richmond the same this coming year as the year 1969–70, it can readily be seen that it was anticipated that approximately 10,000 students would have been transported either by school board buses or V.T.C. on a daily basis during the school year, as contrasted with plaintiffs' proposed plan which would require, if implemented, the transportation of approximately 15,000 students; and if all children living more than one mile from the school to which they would be assigned under the school board's recently submitted plan, hereinafter referred to as the board's second

plan, were transported, transportation facilities would be required to accommodate 15,903 students. Assuming further that the school board's estimate that of those 15,903, approximately one half, so it is anticipated, would provide transportation of their own in one form or another, it still would require transportation of 7,951 students using the facilities of the Virginia Transit Company, plus the 4,991 to be transported under the direct auspices of the school board, for a total of 12,942 students.

▇ The Court finds further that unquestionably, regardless of what plan may ultimately be approved, the children in the newly annexed area of Chesterfield will require transportation by virtue of the physical surroundings, i. e. lack of sidewalks, etc.

The Court finds that, assuming arguendo that the Court approved plaintiffs' proposed plan of desegregation, the lack of available transportation facilities immediately accessible would preclude the adoption of same commencing with the opening of school for 1970–71. The plaintiffs' plan, in order to be put into effect, would require the purchase of additional school buses should the school board wish to augment their present school bus fleet as distinguished from utilizing the Virginia Transit Company.

It is to be noted that the Court in this finding does so on the basis of the lack of *immediate* accessibility to transportation facilities, although the Court has in fact concluded that with the staggering of school hours, as well as the utilization of the school board's present fleet, coupled with the utilization of V.T. C. facilities, might well result in sufficient transportation needs. The difficulty is, however, that at this late date to require any such actions on the part of the school board might well result in a system which would be detrimental to the educational values which the Court is satisfied can be maintained by less precipitous action. In any event, the Court finds the plaintiffs' plan to be reasonable regardless of whether it would or would not require additional transportation.

Obviously, from the state of the record at this stage, additional buses from some source would be necessary to implement plaintiffs' plan.

The plaintiffs contend that their suggested plan could be put into effect by the purchase of 45 additional buses. The defendants, on the other hand, contend that there will be a need for anywhere between 97 additional buses and 257, depending on whether a bus is used for just one run per bus or two runs per bus, and they contemplate 50 pupils per bus at the high school level and 66 at the junior and elementary level; all of this in spite of statistics shown by the report of the Superintendent of Public Instruction for the Commonwealth of Virginia showing, as heretofore pointed out, that cities operating school buses throughout the state for the year 1968–69 had an average of 122 students per each bus operated.

The distances between the suggested paired schools under the plaintiffs' proposed plan range from approximately 5.8 miles to 12 miles. The travel time from one suggested paired school to another during the peak hour of traffic ranges somewhere between 30 to 50 minutes, with the average time being closer to 35 minutes. The number of contemplated runs per bus would determine to a great extent the amount of additional transportation needed. In order to qualify for reimbursement of a proportion of the operating cost of said buses, each bus would have to acquire sufficient mileage on a daily basis to amount to 16 miles. Staggered school hours, as contemplated in the defendant school board's second proposed plan, would do much to reduce the time allocated to transportation.

In summary as to this facet of the Court's findings, the Court finds that the defendant school board's budget for the fiscal year 1970–71 approximates 60 million dollars. In addition, the Court finds that the average cost of operation of school buses for cities in Virginia, after receipt of the average state reimbursement as heretofore discussed, re-

sults in a net cost approximating $1,400.-00 per bus.

 Having concluded that the capital that may be required to purchase additional buses, in the Court's opinion, would represent less than 1% of the defendant school board's budget for the year 1970–71, and this even if the plaintiffs' estimate of additional buses is doubled, and concluding that even should the defendants' most exaggerated estimates both for capital outlay and operating costs, which the Court does not accept as factual, were correct, the plaintiffs' suggested plan is, in the Court's opinion, reasonable. Nevertheless, the implementation of same at this time is neither required nor appropriate under the principles of law enunciated in this Circuit and by which this Court is bound, as will be further discussed in the conclusion of this memorandum.

### Defendant School Board's Second Plan

At the conclusion of the hearing on June 26, 1970, the Court announced from the bench its inability to accept the H.E.W. plan for the reasons stated in the record of that hearing, and the Court adopts and incorporates herein its findings and conclusions as enunciated from the bench at that time. The Court did, as heretofore set out, grant leave to the school board to submit another plan if they so desired. That plan was filed on July 23, 1970, and a hearing on same was conducted on August 7, 1970.

Briefly stated, the defendant school board's second plan, which the Court intends to accept for the reasons contained in this memorandum, contemplates that in the pre-annexation area of the city the primary elementary schools would house grades K–5, the middle schools would house grades 6–8, and the high schools would house grades 9–12. In the newly annexed area of the city it is contemplated that the primary elementary schools would house grades K–6, the middle schools grades 7–9, and the high schools grades 10–12. Some exceptions were contemplated in the basic organizational structure of the high schools where necessary because of space limitations.

Generally, the boundaries of the high schools were drawn so as to be contiguous, with the exception of Kennedy High School. Satellite zoning was utilized.

The school board contemplates that its plan will be implemented through the use of Virginia Transit Company regular bus line transportation, coupled with a minimum staggering of opening and closing of schools in that they contemplate some schools opening at 8:00, some at 9:00 and some at 10:00, with closing times to be 2:00, 3:00 and 4:00 o'clock for the respective students involved.

Portions of the plan were drafted, and properly so under the circumstances in the Court's opinion, to accommodate the existing arrangements with Chesterfield County for the exchange of students. It is contemplated that the Thompson and Elkhardt middle schools will house grades 7, 8 and 9 until the school board of the City of Richmond concludes its temporary agreement with Chesterfield County.

The plan itself, of necessity, was drafted with a view in mind to utilize transportation where required. The Court finds from the evidence that the Virginia Transit Company can accommodate such additional volume of transportation as may be required to implement this second proposed plan.

The attendance areas set out for the primary elementary schools were drawn with the understanding that Virginia Transit Company would maintain its present special elementary school bus lines to accommodate elementary pupils who live beyond a mile distance from their respective schools. The Court makes no finding as to whether this is a reasonable distance, but points out that much of the evidence before the Court indicates that a mile and a half may be a more appropriate reasonable distance. The Court recognizes, however, the difficulty in any such precise mathematical conclusion since there must be taken into

consideration the terrain, the traffic patterns, the ages of the children, etc.

As will be discussed later, the plan, while being approved, is not the ultimate which in the Court's opinion is anticipated to be effective pursuant to the requirements of law.

As a supplement to the plan, the school board contemplates the establishment of social studies learning centers to be used with those already existing and in use by the school authorities.

It is contemplated that where the minority race is 10% or less in a particular school, individual classrooms of students in such schools will be paired with individual classrooms of students of the opposite race for the school year in order to provide an integrated educational experience in one of the centers or by inter-school visits. It is contemplated that the upper elementary and middle school students will be scheduled on at least a weekly basis, and those in grades K–3 on the basis of once every two weeks. Transportation from a student's home school to the centers will be provided through the school board's own equipment.

It is apparent that in the draft of this proposed plan the board made effort, utilizing the facilities available, to conform to its interpretation of the laws enunciated by the United States Court of Appeals for the Fourth Circuit.

While the Court must frankly state that more will have to be done to so conform to the law as interpreted by the Fourth Circuit and the United States Supreme Court, it is obvious that an effort has been made by the defendant school board to improve its former suggested presentation. For example, their plan now provides for majority to minority transfers at the cost of the school board. They have amended their suggested faculty assignments to conform to the requirements of law.

It should also be noted that subsequent to the evidentiary hearing on August 7, 1970, the Court was advised by letter from counsel for the defendant school board of their wish to amend their proposed plan at this time to the end that same would pair Stuart and Highland Park schools, the proposal being to house grades 4 and 5 in the Stuart School and grades K–3 in the Highland Park School. This will create a racial mixture in these schools of 70% Black and 30% White.

### High Schools

Two of the high schools under the proposed plan are readily identifiable— Huguenot's student population will be 71% White and 29% Black; John F. Kennedy's student population will be 71% Black and 29% White.

Two other high schools have a disproportionate number of Black to White students. Nevertheless, the progress that has been made is evidenced in the comparison of racial mix so designated in Appendix C.

### Middle Schools

At the middle school level, certain of the schools remain identifiable as Black or White.

### Elementary Schools

That portion of the proposed plan which the Court finds most difficult to approve has to do with the elementary level, for unfortunately almost 9,000 Black students attending 13 schools will be attending schools the population of which will be 90% or more Black, and 4 schools will remain all White. In addition, other elementary schools are racially identifiable.

### Learning Centers

While the Court is impressed with the need for early integrated educational experiences, it must be borne in mind that such centers are not to be adopted as substitutes for the establishment of a unitary school system.

A study of the zones proposed by the defendant school board concerning the following schools: Baker, Broad Rock, Carver, Chimborazo, Fairmount, Greene,

Norrell and Annex, and Whitcomb Court, shows the student composition to be such as to result in no school which is truly integrated, the ratio of student population by race at the respective schools ranging from 99.83% White students and .17% Black students in one school, to 98% Black students and 2% White students in another.

The Court, bearing in mind the rationale that a segregated school is inherently unequal and recognizing further that those students who have been and are being subjected to segregated education in the public schools are, regardless of race, having thrust upon them educational infirmities which are constitutionally impermissible, is much disturbed about the racial composition anticipated under the school board's plan for the eight schools heretofore referred to.

While the record is devoid of any evidence tending to show that any objection to integrated schools is based upon any suggested disproportionate ratio of Blacks to Whites or Whites to Blacks in the student population, and while this Court has made a studious effort to insulate itself from extrinsic matters, the Court would be less than frank if it did not state that its experience in cases of this nature has led it to the conclusion that that factor is one which consciously or subconsciously pervades the thinking process of those officials upon whom the duty falls to assign students to schools.

■ It is the Court's opinion that a school which is not integrated but merely sprinkled, especially involuntarily, with members of another race, may be as equally unfair and disruptive to the educational process as a school which is segregated in spite of the availability of reasonable techniques to desegregate it.

All of the forementioned schools will have student populations ranging from 573 to 964. In one school it is contemplated that there will be one Black student and 573 Whites; in another there will be 12 White students out of a student population of 801. No purpose would be served in enumerating the others.

■ One of the facets in the preparation of the zones for all of the schools has been the dearth of readily available transportation, and even though transportation be available the utilization of same would, as the Court has pointed out, require much administrative detail. Were these zones created, resulting in the particular concern now facing the Court as to these particular schools, by a gerrymandering of same, unless necessary to create a unitary system, the Court, as it has already expressed itself from the bench, would have no difficulty in rejecting them as to these particular schools. Not being satisfied that that is the situation, but concluding that equity does not require the imposing of a condition on elementary students which may be harmful to them and without in any manner resulting in the restoration of constitutional rights to their fellow students who have heretofore been subjected to deprivation of same, the Court in its decree will grant to the Superintendent of Schools the right, upon application by the parent of any student attending the aforementioned schools and who is a member of the minority race therein and who lives as close to another less racially identifiable school, to transfer said student to that school.

■ It must be understood that the Court would, in its opinion, be duty bound to reject the school board's plan under consideration were the plan one which had been submitted for consideration in sufficient time for the board to accomplish that which is required by law for the opening of school in September. This plan, which the Court is approving on an interim basis, is being approved by reason of the fact that it is the school board's plan, that they consider it educationally sound and capable of immediate implementation.

Unlike other cases in this Circuit, wherein school board officials either have or have access to the necessary tools to implement a unitary system, this

school board, except by the use of disruptive educational processes such as great disparities in the opening and closing hours of schools, etc., cannot hope to open the schools as planned within the next two weeks unless the Court approves its plan at this time.

Being satisfied from a preponderance of the evidence that with the use of a transportation system operated by the school board, a plan such as that suggested by Dr. Foster may be implemented without disrupting the educational process, the Court concludes that this is so, however, only when the school officials have sufficient time to work out the many details required. It is not unreasonable for the Court to expect the board to do so, and this be so whether it be by the use of additional transportation or any other method, for the Court is always open for consideration of modifications.

The steps the Court is taking in approving, on an interim basis, the school board's plan as submitted, are taken with full recognition and on the basis of the law in this Circuit as enunciated in Swann v. Charlotte-Mecklenburg Board of Education, *supra*, as well as the mandate of the United States Supreme Court concerning the immediate conversion from dual to unitary systems.

It has been suggested in argument before the bar of the Court that an appellate ruling may be forthcoming which would in some manner pronounce that transportation facilities will no longer be considered as an appropriate tool in the dismantling of dual systems, or, to put it another way, it has been suggested that the United States Supreme Court might decree that regardless of the fact that segregation exists because governmental policies fostered segregated neighborhood schools, that said neighborhood schools may continue to exist in a segregated manner.

This Court is not clairvoyant and does not render its judicial pronouncements on the basis of what it believes an appellate court might or might not do. Constitutional deprivations demand action.

On the other hand, as Judge Butzner has stated in the *Swann* case, the solution is not free from difficulty; and as the Chief Justice noted in the *Northcross* case, Northcross v. Board of Education of Memphis, Tenn. City Schools, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970), there are still practical problems to be determined, not the least of which is to what extent transportation may or must be provided to achieve the ends sought by prior holdings of the Court.

With this in mind, coupled with the reluctance of the Court, except as a last resort, to do anything to interfere with the timely opening of the Richmond public schools, the Court is led to the sincere belief that by approving this interim plan the Court is, as required in this Circuit, adopting the test of reasonableness under the circumstances existing. If, indeed, appellate rulings are forthcoming which, as suggested by counsel, might preclude the use of transportation facilities, then it would appear that this Court would be violating the test of reasonableness, even if school buses were readily available, to direct that the defendant school board immediately expend reasonably large sums of money to acquire them. That situation, in any event, is moot on account of the lack of available buses at this time.

On the other hand, no doubt should be left that this Court, under the state of the law as it now interprets it and in view of the testimony of even witnesses for the defendant school board that the Richmond public schools cannot be desegregated without using the techniques used by Dr. Foster such as noncontiguous zoning, pairing, clustering of schools and transportation, intends to enter such decree as may be appropriate in the premises. It would seem to the Court highly reasonable to require that the defendant school board take reasonably immediate steps toward this end.

Should, of course, in the interim, an appellate ruling be forthcoming which would perhaps more definitively discuss the practical problems referred to by the Chief Justice, then the Court is al-

ways ready to reconsider its conclusions. Until that time arrives, if ever, under the law as it now stands this Court must and does find that the defendant school board's second plan as to all the schools fails to create a unitary system. In addition, the Court finds it to be a start toward the disestablishment of the dual system, and that it would be unreasonable to demand that the ultimate be attained at this time for the reasons heretofore set out.

### Summary

The Court therefore concludes:

1. That compliance with the law of the land can be reasonably effected by the adoption of a reasonable degree of transportation.

2. That the plaintiffs' plan would, if adopted, create a unitary system.

3. That transportation is an acceptable tool in effectuating a unitary system of schools.

4. That while racial balance is not required in each and every school in the system, there is no intractible remnant of segregation in the City of Richmond school system since all parts of the city can be reached by virtue of reasonable amounts of transportation, both as to distances, times and sums involved.

The Court further finds that the adoption of a plan such as suggested by Dr. Foster may well not only create a unitary system, but do much toward the thwarting of resegregation of schools once the unitary system has been put into effect.

The Court further finds that while a unitary system of schools could be effected by the use of the school board's present transportation fleet coupled with the available VTC equipment, to withhold approval of the Board's plan filed July 23, 1970, until satisfactory arrangements could be made would be unreasonable.

The Court finds that the proposed plans submitted by the intervenors and amicus curiae are helpful to the Court but in one instance limited to a specific area of the City of Richmond, and that the implementation of either would not create a unitary system as required by law.

The Court finds that large inventories of used transit and yellow buses are available for procurement within a reasonable amount of time.

The Court finds that regular school buses could be purchased and delivery made within a reasonable amount of time.

The Court finds it reasonable to permit the operation of the schools as suggested by the defendant school board for the opening of schools on August 31, 1970, to the end that the school board and/or the council of the City of Richmond may make further investigation as to the most practical method to attain a unitary system.

The Court finds it reasonable for the rising high school seniors to be permitted to remain in attendance in accordance with their original assignments, particularly in view of the fact that they, as suggested by Mr. Adams, will be most helpful in assisting with orientation programs.

The payment of transportation costs by the defendant school board for the benefit of the annexed pupils may well create a problem in reference to whether or not all are entitled to school board paid transportation. The Court finds that transportation costs have been borne by agencies other than the school board in certain situations. In addition, the Court finds that the school board supplies certain necessities pursuant to its participation in programs sponsored by the Office of Economic Opportunity. Accordingly, the Court requests counsel to address themselves, in memorandum form, to the issue whether the burden of the cost of public transportation for all students should be borne by the school board. In the interim the Court will direct that the school board furnish upon request transportation to any child living more than one mile from school whose family meets economic criteria set forth for participation in

programs sponsored by the O.E.O., provided, however, that the school board shall not be obligated to furnish free transportation when such transportation is furnished by some other public agency.

These conclusory findings are not by way of limitations to findings previously made during the course of this memorandum, but are deemed to be supplemental thereto.

## Conclusions of Law

The conclusions of law reached by the Court as enunciated in this memorandum have been based upon the following authorities:

I. Racially restrictive covenants are prohibited and violative of the Fourteenth Amendment. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L. Ed. 1161 (1948).

II. School boards are not prohibited from considering race in disestablishing segregated schools. Wanner v. County School Board of Arlington County, Va., 357 F.2d 452 (4th Cir. 1966).

III. Plaintiffs are entitled to a decree requiring the reasonably immediate conversion of the Richmond public schools into a unitary school system. Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Northcross v. Board of Education of Memphis, 397 U.S. 232, 90 S.Ct. 891, 25 L.Ed.2d 246 (1970); Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L. Ed.2d 477 (1970).

IV. The defendant School Board has an affirmative duty to convert to a unitary school system in which racial discrimination would be eliminated root and branch. Green v. County School Board of New Kent County, 391 U.S. 430, 437, 88 S.Ct. 1689, 20 L.Ed. 2d 716 (1968).

V. Transportation is a permissible tool for achieving integration. Swann v. Charlotte-Mecklenburg Board of Education, 431 F.2d 138 (4th Cir. 1970).

VI. Transportation as a tool for the desegregation of public schools is not one of constitutional dimensions, but one of remedy. Green v. School Board of Roanoke, 428 F.2d 811 (4th Cir. 1970).

VII. The definition of a unitary school system as being one "within which no person is to be effectively excluded from any school because of race or color," leaves open practical problems. Alexander v. Holmes County Board of Education, supra; Northcross v. Board of Education of Memphis, supra; Swann v. Charlotte-Mecklenburg Board of Education, supra.

VIII. In consideration of transportation there should be considered the age of the pupils, distance and time required, cost in relation to resources. Swann v. Charlotte-Mecklenburg Board of Education, supra.

IX. District Courts are charged with the enforcement of the dictates of appellate courts and are to have a practical flexibility in shaping remedies. Brown v. Board of Education, 349 U.S. 294 at 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1954); Green v. County School Board of New Kent, supra; Stanley v. Darlington County School District, 424 F.2d 195 (4th Cir. 1970).

X. Conversion to a unitary school system requires assignment of faculty members to each school in the system in accordance with the ratio of white and black faculty throughout the system. United States v. Montgomery County Board of Education, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); Swann v. Charlotte-Mecklenburg Board of Education, supra.

XI. District Courts in this Circuit are bound to adopt the test of reasonableness as distinguished from absolutes. Swann v. Charlotte-Mecklenburg Board of Education, supra.

XII. School boards must take affirmative steps to overcome racially

segregated attendance patterns related to residential segregation where the boards, through site selection and construction policies or other governmental agencies, have participated in the development of such patterns. Brewer v. School Board of Norfolk, 4 Cir., 397 F. 2d 37; Swann v. Charlotte-Mecklenburg Board of Education, *supra*; Clark v. Board of Education of Little Rock, 426 F.2d 1035 (8th Cir. 1970); United States v. School District 151, 404 F.2d 1125 (7th Cir. 1968).

XIII. School boards may not adopt pupil assignment plans which result in segregated schools as a result of private residential discrimination creating segregated housing patterns. Brewer v. School Board of Norfolk, *supra*; Clark v. Board of Education of Little Rock, *supra*; Swann v. Charlotte-Mecklenburg Board of Education, *supra*; United States v. Guest, 383 U.S. 745, 86 S. Ct. 1170, 16 L.Ed.2d 239 (1966).

XIV. Geographic attendance zones are constitutionally permissible only if they actually assist in integrating a school system as distinguished from reinforcing an existing pattern of segregated schools. United States v. Indianola Municipal Separate School District, 410 F.2d 626 (5th Cir.) cert. den. 396 U.S. 1011, 90 S.Ct. 571, 24 L.Ed.2d 503 (1969); Valley v. Rapides Parish School Board, 423 F.2d 1132 (5th Cir. 1970).

XV. The adoption of an educational theory having the effect of maintaining a pattern of racial separation is impermissible. Dove v. Parham, 282 F.2d 256 (8 Cir. 1960); United States v. School Board of Franklin City, 428 F.2d 373 (4th Cir. 1970).

XVI. Approval of the instant plan on an interim basis is appropriate on the grounds of reasonableness and reality. Swann v. Charlotte-Mecklenburg Board of Education, *supra*; Brunson v. Board of Trustees of School District No. 1 of Clarendon County, S. C., 429 F.2d 820 (4th Cir. 1970) (Craven, J., separate opinion).

XVII. Patterns of new school construction must be such as to affirmatively promote the creation of a unitary school system. United States of America v. Board of Education, Independent School District No. 1, Tulsa County, Okl. 429 F.2d 1253 (10th Cir. 1970).

### ORDER

For the reasons stated in the memorandum of the Court this day filed, and deeming it proper so to do, it is adjudged, ordered and decreed:

1. That the defendant school board's proposed plan, filed July 23, 1970, for the operation of the Richmond public schools for the term commencing August 31, 1970, be, and the same is hereby, approved, except as hereinafter set out.

2. Leave is granted to the Superintendent of Schools, upon application by the parent of any student attending the following named schools, and who is a member of the minority race therein, and who lives as close to another less racially identifiable school, to transfer said student to that school: Baker, Broad Rock, Carver, Chimborazo, Fairmount, Greene, Norrell and Annex, Whitcomb Court.

3. Members of the faculty and staff shall be assigned so that in each school the racial ratio shall be approximately the same as the ratio throughout the system, with exceptions being made only for specialized faculty positions.

4. The defendant school board shall furnish upon request transportation in accordance with the provisions of that section of the memorandum styled "Summary" pertaining thereto.

5. The defendants are directed to file with this Court, within 90 days from this date, a report specifically setting out such steps as they may have taken in order to create a unitary system of the Richmond public schools and specifying in said report the earliest practical and reasonable date that any such system could be put into effect. The parties are reminded that the approval referred to in paragraph 1 of this order is not

to be interpreted as a finding that the implementation of that plan results in a unitary system of schools.

6. Counsel for the plaintiffs and the defendant school board are directed to confer with a view in mind to attempting to reach agreement as to the payment of counsel fees and costs, and to report to the Court the results thereof within 45 days of this date.