### Carolyn BRADLEY et al.,
### v.
### The SCHOOL BOARD OF the CITY OF RICHMOND, VIRGINIA, et al.

#### Civ. A. No. 3353.

United States District Court,
E. D. Virginia,
Richmond Division.

April 5, 1971.

See also, D.C., 324 F.Supp. 456.

J. Segar Gravatt, Blackstone, Va., for defendant School Board of Chesterfield County.

Oliver D. Rudy, Commonwealth's Atty., for Chesterfield County, Frederick T. Gray, Walter E. Rogers, Richmond, Va., for Board of Supervisors of Chesterfield County.

Everette G. Allen, Jr., Richmond, Va., for intervenors .Bellevue-Ginter Area Civil Ass'n, Robert Douglas Bain, and Sherwood Park Civic Ass'n.

Frederick T. Gray, Walter E. Rogers, Richmond, Va., for intervenors Noel Austin and others.

John S. Battle, Jr., William H. King, Jr., Richmond, Va., for intervenors Westover Hills Parent-Teachers Ass'n.

Norman J. Chachkin, New York City, Louis R. Lucas, Memphis, Tenn., M. Ralph Page, James R. Olphin, Richmond, Va., for plaintiffs.

George B. Little, John H. O'Brion, Jr., James K. Cluverius, Richmond, Va., for defendants Superintendent of Schools and School Board of the City of Richmond.

Andrew P. Miller, Atty. Gen. of Virginia, William G. Broaddus and D. Patrick Lacy, Jr., Asst. Attys. Gen., for defendants State Board of Education and Superintendent of Public Instruction.

Robert D. McIllwaine, III, Petersburg, Va; J. Mercer White, Jr., County Atty., for Henrico County, L. Paul Byrne, Richmond, Va., for defendants School Board and Board of Supervisors of Henrico County.

## MEMORANDUM

MERHIGE, District Judge.

The issue now before the Court is that of the plan to be adopted for the operation of the public schools of the City of Richmond for the 1971–72 school year, based upon the assumption that the city will then operate as it has heretofore, as a single administrative unit for school purposes.[1]

The Court has previously determined that one plan before it, that presented in June 1970 hearings by the plaintiffs' expert witness, Dr. Gordon Foster, will achieve a unitary school system within this context. Bradley v. School Board of City of Richmond, 317 F.Supp. 555, 576 (E.D.Va.1970). The Foster proposal was formulated with an eye to the 1970–71 school year, but at the Court's request the School Board has supplied up-

1. The record will disclose that there is now pending before the Court in this school desegregation case a yet to be determined issue concerning the duty or duties, if any, imposed by law upon certain defendants joined by leave of Court granted Dec. 5, 1970. The conclusions contained in this memorandum are accordingly predicated solely on the state of the record insofar as same applies to the present duty of those defendants who were parties to the suit prior to the joinder motion; without consideration of the issues involving the joined defendants. Trial of those issues, depending on the evidence and the law, may or may not disclose further obligations on all parties. Nevertheless, it having been represented to the Court by the defendant, Richmond School Board, that implementation of at least one of the proposed plans would entail a minimum delay of 90 to 120 days, and for further reasons more fully enunciated in the balance of this memorandum, the Court addresses itself to the plan to be adopted solely in the context referred to in the first paragraph of this memorandum.

to-date attendance projections based on that plan's zone lines so that its suitability for the 1971–72 year may be judged.

In addition, the School Board has presented three possible plans assertedly calculated to create a unitary system. This Court had ordered the defendants on August 17, 1970, to:

> File with this Court, within 90 days of this date, a report specifically setting out such steps as they may have taken in order to create a unitary system of the Richmond public schools and specifying in said report the earliest practical and reasonable date that any such system could be put into effect.

The School Board, on November 16, 1970, advised the Court that three definitive plans would be submitted on January 15, 1971. Reportedly these were designed to meet three possible measures of the extent of the School Board's legal duty which, it was foreseen, might emerge from pending cases in the Supreme Court.

■ In the resolution of the instant issue the Court is guided by one major and one subsidiary legal doctrine. First, the adequacy of any proposed plan must be ascertained by reference to the current state of the law. For this Court, the law, in this regard, is that which has been enunciated by the most recent decisions of the United States Supreme Court and rulings of the Fourth Circuit Court of Appeals consistent therewith. For the Court to act on speculation concerning possible modifications to the extent of this Court's equitable power and duty to implement the fourteenth amendment would be inconsistent with its position in our system of tribunals. Stanley v. Darlington County School District, 424 F.2d 195, 198 (4th Cir. 1970).

Moreover, the Court has determined that further delays in affording the plaintiffs what these defendants owe them under the Constitution, such as that occasioned by this Court's denial of further relief during the second semester of the current school year, cannot be justified either by precedent or by practicality. In practical terms, if upcoming rulings place obligations of lesser magnitude than does current law on school officials, and if thereafter these defendants seek relief from orders requiring more of them than is legally required, the expense and disruption of conversion to a less costly program of integration will in all probability be far less than the cost of a hasty reorganization to conform to current law, if such law remains viable. The School Board of the City of Richmond, through its counsel in open court, has represented that the rapid conversion to a "neighborhood" school organization is feasible. The expense of preparing for the final desegregation of Richmond's schools as current law requires is indeed a minimal price to pay for the assurance that, whatever binding constitutional interpretations intervene, the rights of all citizens affected thereby will be protected.

■ Furthermore, the clear mandate of appellate courts precludes delay. Carter v. West Feliciana Parish School Board, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970). See also, Swann v. Charlotte-Mecklenburg Board of Education, 399 U.S. 926, 90 S.Ct. 2247, 26 L.Ed.2d 791.[2] Bases for a conclusion that appellate courts endorsed postponement of desegregation pending decisions on certain school cases now in the Supreme Court are disappearing as decisions issue from our Court of Appeals. On balance, and in view of the insubstantiality of evidence of the expenses to be incurred irretrievably in reliance on the viability of an appropriate desegregation order, the Court has concluded that further delay in the grant of relief, while the parties await additional authoritative rulings, cannot be justified by either precedent or any rule of reason.

■ The unequivocal pronouncements of the United States Supreme Court in Alexander v. Holmes County Board of

**2.** U. S. Supreme Court in granting writ of certiorari reinstated District Court's judgment and ordered it to remain in effect pending appellate proceedings.

Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), to the effect that under the Court's "explicit holdings, * * * the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools," is the law of the land.

The viability of defendants' suggestion that this Court should await further appellate rulings by reason of the extensions of time granted by the Fourth Circuit Court of Appeals in the filing of briefs and this Court's granting further time for filing and docketing the appeal record in this case, pertaining to defendant School Board's appeal of the Court's order of August 1970, loses much potency in the examination of the record.

On August 17, 1970, the Court ordered the implementation of the interim plan; stays of that order were denied by this Court, the Fourth Circuit Court of Appeals and the United States Supreme Court within a matter of days. The record was delivered to the Clerk of the Fourth Circuit on September 25, 1970. The lack of any action by the Court of Appeals can hardly justify a request that this Court await an appellate pronouncement as to the propriety of its order of August 17, 1970. A more realistic consideration, at least to this Court, is that any delay so far occasioned in the Fourth Circuit's considering this Court's refusal to approve the first plan submitted (HEW plan) and its conclusions in reference to the interim plan, arises by reason of the defendants' request to the Fourth Circuit that the matter lie in abeyance. Their standing to now utilize such delay as grounds for inaction is at the least suspect. This is particularly significant when one considers the fact that a delay now may preclude the opening of schools in the Fall as scheduled. Their original requests to the Fourth Circuit that the matter lie in abeyance were undoubtedly based on valid and compelling reasons, and ones which the Court has no doubt were at the time both appropriate and wise, since defendants understandably anticipated a further rul-

ing by the United States Supreme Court in pending cases; and this Court is still hopeful of such prior to the opening of school in the Fall. Nevertheless, to now accord that passivity the dignity of a compelling reason for this Court to ignore the clear mandate to see to it that the explicit holdings as to the timing of desegregation matters, as stated by the United States Supreme Court, are implemented, is to compound the difficulties which understandably follow any desegregation plan.

Appellate procedures provide for stays of this Court's orders in appropriate circumstances. The delays heretofore granted were based primarily on the impossibility of implementing a unitary plan in a manner so as not to conflict with the defendants' proposed scheduling of the opening of school, and indeed there were in addition other equitable principles considered by the Court in its refusal to accede to plaintiffs' request for implementation of a unitary plan at mid-term. Those same principles, however, now dictate that a plan be approved promptly, not only because there is time in which to implement it, but there is time for all the parties to utilize the appellate process in such a manner as to hopefully preclude a delay in the opening of schools in the Fall. Such procedure is consistent with our system of law and one in which it is hard to envision any lack of acquiescence by parties presumably dedicated to constitutional principles.

■ A second principle guiding the Court—almost as obvious as the doctrine of precedent—is that it is primarily the School Board's duty to run the schools, and not this Court's nor the plaintiffs'. It is the school administrators' duty, as well as the duty of the City Council, moreover, to afford the equal protection of the laws. This principle requires no further countenance by the Court of the city defendants operating Richmond schools, beyond the present term, in a manner inconsistent with their duty, so far as feasible in the context with which we now deal, to desegregate the schools under their control. Because

both expertise and responsibility are the School Board's, it is to their proposals that courts look first for a legally sufficient plan. "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*," Green v. County School Board of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968) (italics original); Alexander v. Holmes County Board of Education, supra. When they assume the "reponsibility which Brown II placed squarely on the School Board," *Id.*, 442, 88 S.Ct. 1696, courts will not presume to dictate a selection between equally effective desegregation plans. Wanner v. County School Board of Arlington County, 357 F.2d 452, 456 (4th Cir. 1966).

The measure of the board's duty in a system such as Richmond's is clear:

> "The school board in devising its plan and the district court in considering whether or not it is adequate must explore every reasonable method of desegregation, including rezoning, pairing, grouping, school consolidation, and transportation, including a majority to minority transfer plan. In short, any and all reasonable means to dismantle the dual system and eliminate racial characteristics in the Roanoke schools must be utilized * *." Green v. School Board of the City of Roanoke, 428 F.2d 811, 812 (4th Cir. 1970); see also Swann v. Charlotte-Mecklenburg Board of Education, 431 F.2d 138, 142 (4th Cir. 1970).

## PLAN I

██ Under these standards the proposed School Board plan 1 is obviously deficient. By its own rationale, it is limited to attempting desegregation by means of "proximal geographic zoning." The zone lines are not drawn according to a fixed principle that each child shall attend the closest school insofar as capacity allows; the lines are rather discretionary in the sense that transportation opportunities and "physical barriers, boundaries, and hazards" are considered

in their formulation. Four of seven high schools, as a result, are over 90% of one or the other race; of the ten middle schools, five are over 90% of one or the other race, and two are over 80% black. There are 36 separate elementary schools, and of these all but ten would be over 90% white or black. In *Swann*, the Fourth Circuit endorsed the District Court's disapproval of a desegregation plan predicated on a rejection of more effective desegregation techniques such "as pairing, grouping, clustering, and satellite zoning," *Id.*, 146, in favor of a contiguous geographic zoning scheme. The plan left half or more of the students at the elementary level in schools with a majority ratio—white or black—of 86% to 100%. The predicted results under Richmond's plan 1, by way of comparison, are as follows:

| | White | Black |
|---|---|---|
| 1. Students in schools with 90% or more of their own race — | | |
| (a) elementary: | 6,385 | 10,456 |
| (b) middle school: | 2,161 | 4,203 |
| (c) high school: | 1,528 | 4,613 |
| 2. Total students — | | |
| (a) elementary: | 9,575 | 15,071 |
| (b) middle school: | 4,104 | 7,579 |
| (c) high school: | 3,953 | 7,505 |

At each level, save high schools, where almost 39% of white pupils are isolated in one 97% white school, well over half of the students of either race are assigned to schools which, given Richmond's 63.1% black, 36.9% white total enrollment, are unquestionably racially identifiable. Given the self-imposed restrictions on which plan 1 is predicated, it is not surprising that this plan cannot work to provide a unitary system. The results reveal its unconstitutionality.

Regardless of the desirability of neighborhood schools, particularly at the elementary level, the housing patterns heretofore fostered by governmental action in the City of Richmond, as more fully amplified in the Court's memorandum of August 17, 1970, preclude their utilization as a truly effective means of complying with the present state of the law.

## PLAN II

■ Plan 2, which the School Board urged the Court to approve at the recent hearings, likewise fails to fulfill the defendants' duty. This proposal is similar to the interim plan in use during 1970–71, which this Court held in August of 1970 could not create a unitary school system. The considerations supporting the Court's approval of the interim assignment plan are amply set out in the Court's memorandum of August 17, 1970. For reasons heretofore stated, these considerations no longer appear to the Court to outweigh the imperative to afford each child, to the extent it is within the power of the city defendants, what the Constitution says is his.

Passing the question of the middle and high school portions of plan 2, which are incorporated in plan 3 discussed below, the Court is convinced that the student body compositions projected for the elementary schools under this plan betray a continuation of segregated education. As in plan 1, elementary school attendance is governed by zone lines. The School Board also permitted itself the tool of consolidation of schools with adjoining zones—contiguous pairing—and the device of allowing majority to minority transfers with paid public transportation. Twelve elementary facilities which would operate separately under plan 1 are merged into six pairs under plan 2.

Progress beyond the desegregation achieved in 1970–71 under the interim plan is less than remarkable under plan 2. Nineteen elementary schools still would have enrollments 90% or more white or black; 8,022 black students of 15,071 and 5,621 whites of 9,575 would be isolated in these readily identifiable schools. By way of comparison, September 25, 1970, attendance figures reveal that at that time 10,312 of the 15,479 black elementary pupils were in elementary schools with 90% or more black enrollment, and 4,138 out of 9,051 white pupils were in 90% or more white schools. Plan 2 at this level, like the interim plan, falls short of legal requirements. A plan strikingly similar to this one, limited in the desegregation techniques used and in the results achieved, was found insufficient in the *Swann* decision. Under that precedent and because the evidence reveals that with modest and reasonable further efforts much more desegregation can be achieved in the City of Richmond, the Court must refuse approval of plan 2.

## PLAN III

Plan 3 is a different matter. The administrators outline their goals in this manner:

"Plan III represents an effort on the part of the School Board to develop a plan for the operation of the Richmond Public Schools in which the attempt is made to remove from the public schools all vestiges of racial identity. The removal of all vestiges of such alleged identity involves whatever means are at the disposal of the School Board. These means include extensive busing of students, proximal geographic zoning, pairing, clustering, satellites, and racial balance among faculties.

\* \* \* \* \* \*

"At the elementary level all schools will have a minority-majority ratio in which each group will be at least one half or 50 percent of the projected city-wide ratio for that group.

\* \* \* \* \* \*

"Thus, a given school would have a projected enrollment of at least 17 percent white, or at least 33 percent black.

\* \* \* \* \* \*

"Attendance zones at the middle school and high school levels have been adjusted to provide projected minority-majority ratios in accordance with the formula stated above for the elementary level.

"Transportation under Plan III will utilize the same accommodations as are presently in use (i. e., Virginia Transit Company and buses operated by the School Board) for the middle school and high school levels. Elementary children requiring transportation will

be served by buses operated by the School Board where Virginia Transit Company transportation is not available."

## HIGH SCHOOLS

Superintendent Adams testified that a major virtue of the secondary level parts of plan 3 is that they comprise no drastic changes from the current attendance patterns; disruption from their institution would therefore be minimal. The results of plan 3 at this level, compared with figures for September 25, 1970, are as follows:

| School: | 9/25/70 | | Plan 3 | |
|---|---|---|---|---|
| | White % | Black % | White % | Black % |
| Armstrong | 25 | 75 | 30 | 70 |
| Huguenot | 80 | 20 | 57 | 43 |
| Jefferson | 57 | 43 | 41 | 59 |
| Kennedy | 7 | 93 | 25 | 75 |
| Marshall | 27 | 73 | 21 | 79 |
| Walker | 21 | 79 | 26 | 74 |
| Wythe | 56 | 44 | 43 | 57 |
| Total: | 38 | 62 | 35 | 65 |

The changes are brought about principally by altering noncontiguous "satellite" zones created for schools which are sited in racially homogeneous areas; Kennedy now would draw whites from a zone south of the James, and Huguenot has a new satellite zone on the extreme northeast part of the city. The Marshall zone has also been altered.

██ A comparison of the projected racial attendance figures for each school with the systemwide ratio reveals that by no means has a "racial balance," equivalent to the over-all proportion, been achieved in each school. Nonetheless the School Board, if this proposal succeeds as planned, will have eliminated the racial identifiability of each facility to the extent feasible within the City of Richmond. This is the extent, under current law, of the affirmative obligation governing use of its available powers: to do away with a system under which one may confidently predict those schools which a given child may attend, and those from which he is effectively barred, by reference to his race.[3]

The School Board proposes to make an exception to its zone attendance system for certain high school students. Seniors, which term the Court understands to refer to pupils who can be anticipated to graduate from high school in June, 1972, or before, would be allowed to elect to remain in the school they attended during 1970–71. The Court permitted a similar provision in the interim plan in order to preserve the school leadership contribution that these older students provide, something which was thought valuable during a difficult transition period. Although such a provision in the 1971–72 plan makes it numerically a less effective method, the Court believes that the same considerations which were persuasive in August still hold, particularly in the light of the rather insubstantial effect such an option would have on the effort to desegregate.

Only 222 students would be affected: 115 pupils now in Kennedy and placed under plan 3 in the east end of the Marshall zone, 65 now at Huguenot and two now at Jefferson who are assigned to Kennedy under plan 3, and 40 students now in Marshall and placed in the new Huguenot satellite zone in the east end under plan 3. If all exercise their option, Kennedy will become 20.6% white and 79.4% black; Huguenot will be 53.6% white and 46.4% black, and Marshall will be 20.9% white and 79.1% black. The only change worth noting is at Kennedy, and that school would still be very close to Marshall's composition. Because the senior option will not alter the desegregated character of the system, it is a permissible element of the plan.

## MIDDLE SCHOOLS

In 1971–72 it is proposed that Richmond employ a basic middle school struc-

3. This conclusion is based upon what can be reasonably expected within the geographical boundaries from which the students for whom the School Board now has responsibility come.

ture comprising grades six through eight; at one facility grade nine also will be taught at a middle school to mesh with the grade plan of a nearby high school, Huguenot, which omits that grade.

Plan 3 builds at this level, as at the high school level, on the interim plan now in effect. Noncontiguous pairing and satellite zoning are used. Grade assignments as between paired schools have not yet been finally determined; consequently attendance figures and ratios for each pair, rather than each individual facility, are before the Court. The projections are as follows:

| School(s): | White % | Black % |
|---|---|---|
| Bainbridge & Maury: | 43 | 57 |
| Chandler & Norrell Annex: | 19 | 81 |
| East End, Bacon, & Old Chimborazo: | 30 | 70 |
| Elkhardt: | 54 | 46 |
| Graves: | 30 | 70 |
| Hill & Binford: | 22 | 78 |
| Mosby: | 26 | 74 |
| Thompson & Westover: | 61 | 39 |
| Totals: | 35 | 65 |

Although the proposal[4] has some doubtful elements, it does not if implemented, fail to achieve unitary system, so far as reasonably feasible in Richmond.

The Elkhardt school was 73% white in 1970–71; Thompson was 63% white. Under the new plan these, the only two former white-majority middle schools, retain that character. Neither comes close, however, to having double the city wide proportion of whites in its enrollment. Nonetheless, there is a danger, recognized by the Fourth Circuit, that a school with a substantially greater white ratio than others in the system may act as a magnet, inducing whites to move into the attendance area, thus exaggerating still further the difference between its composition and that of other schools. Resegregation of the facilities losing and gaining whites may be the result. See Swann v. Charlotte-Mecklenburg Board of Education, supra, 431 F.2d 145. No specific modifications to the School Board's middle school plan designed to alleviate this situation have been proposed, however. In view of the overall educational superiority of plan 3 at this level to the Foster plan, discussed below, the Court will approve its use despite this possible genesis of future problems. Much greater deviations in a few individual schools from the system-wide ratio have failed in the past to provoke appellate criticism. See, e. g., Allen v. Asheville City Board of Education, 434 F.2d 902, 903 n. 1 (4th Cir. 1970). The Court will, as required by the law, of course, retain jurisdiction over the case and monitor the operation of the plan to insure, if reasonably and legally appropriate, that resegregation does not take place. Majority-minority transfers, furthermore, may be expected to play a small part in preventing such an occurrence.

4. It should be noted that the first three listed pairs each in fact constitute facilities located so close to one another that it may be possible to operate them as single multi-building schools, at least administratively. At the hearing on March 4, Superintendent Adams proposed one modification from the plan theretofore offered, which change is not reflected in the zone descriptions and overlays. The Court considers the plan as thus altered. The two Mosby middle school zones are joined by the addition to that school's area of that portion of the Graves zone east of the Chesapeake & Ohio Railway tracks. The Graves zone, in turn, is expanded northward, taking in all of the former Mosby Zone 2 west of the railroad tracks to a point sufficient to add a number of students equivalent to those lost by severing the eastern end of the Graves zone. North of that point, students formerly placed in Mosby go instead to Chandler; about 89 are involved in this move, and there is adequate capacity in Chandler. About 327 students are shifted between Mosby and Graves and vice versa. Nearly all, if not all, are black. The racial makeup of all facilities remains substantially as forecast, and the changes are justified in the interests of ease of transportation.

## ELEMENTARY SCHOOLS

At this level, schools are organized on a kindergarten through fifth grade pattern throughout. There is extensive pairing, contiguous and non-contiguous; where this is done there are usually three consecutive grades taught in each facility. The plan is built upon the same attendance zones as were used in plan 1.

The organization and projected attendance ratios are as follows:

| Schools: | Grades: | White % | Black % |
|---|---|---|---|
| Blackwell & Annex: | K–5 | 20 | 80 |
| Broad Rock & Whitcomb Court | 3–5 K–2 | 39 | 61 |
| Clark Springs: | K–5 | 36 | 64 |
| Robert Fulton & Webster Davis | K–2 3–5 | 46 | 54 |
| Fisher & Carver | K–2 3–5 | 46 | 54 |
| Fox & West End | K–2 3–5 | 35 | 65 |
| Francis & Fairmount | K–2 3–5 | 46 | 54 |
| Ginter Park- Brook Hill & Stuart | K–2 3–5 | 28 | 72 |
| Greene & Fairfield Court | 3–5 K–2 | 47 | 53 |
| Patrick Henry & Franklin | K–2 3–5 | 55 | 45 |
| Lee & Amelia-Maymont | 3–5 K–2 | 24 | 76 |
| Munford & Highland Park–Annex | K–2 3–5 | 33 | 67 |
| Bellemeade & Oak Grove–Annex | K–2 3–5 | 66 | 34 |
| Reed & Woodville | K–2 3–5 | 40 | 60 |
| Reid & Mason-Bellevue-Bowler | K–1 2–5 | 36 | 64 |
| Southampton & Baker | K–2 3–5 | 40 | 60 |
| Summer Hill- Ruffin Road & Chimborazo | K–2 3–5 | 39 | 61 |
| Westhampton & Norrell | 3–5 K–2 | 29 | 71 |
| TOTALS: | | 39 | 61 |

Superintendent Adams testified that the only means to desegregate the city's elementary schools in the upcoming year would be through the use of noncontiguous pairing and transportation. As the preface to the plan indicates, these are among the techniques considered and employed under plan 3. As a result, of the thirty-six elementary facilities, only four have majority white enrollments, and three others have over 75% black student bodies. Overall the elementary grades are 39% white and 61% black. No school, under the board's projections, will depart from its general guideline of enrolling at least fifty percent of the systemwide ratio of each race, that is, at least 18½% white and 30½% black students. In *Swann*, where a 71% white and 29% black elmentary system was in issue, the district court approved a plan under which the ratio of black students went from 9% to 38%. The Court of Appeals remanded for consideration of further factors involving the techniques to be used in desegregating, but failed to find the plan nonunitary. To approve Richmond's plan 3, where the deviations from parity are within an even narrower range, would not be an abuse of discretion in consequence. As in the case of the middle schools, furthermore, close monitoring to forestall, if reasonably possible, resegregation, and the use of majority to minority transfers, can be expected, the Court believes, to maintain the desegregated character of the system.

## FACULTY AND STAFF

The rule in this circuit is that, in order to remove the identification of particular facilities as intended for students of one or the other race, faculty and staff assignments should be made so that each school's contingent reflects in its makeup the racial composition of the faculty and staff of the whole system. Brewer v. School Board of City of Norfolk, 434 F.2d 408, 412 (4th Cir. 1970); Nesbit v. Statesville City Board of Education, 418 F.2d 1040, 1042 (4th Cir. 1969). On March 4, 1971, the School Board submitted a report of assignments as they stood on September 25, 1970. In summary, the racial breakdown of the

system's teachers and administrators is as follows:

| | White % | Black % |
|---|---|---|
| High schools: | 51 | 49 |
| Middle schools: | 45 | 55 |
| Elementary schools: | 43 | 57 |
| Special departments: | 59 | 41 |
| Total: | 47 | 53 |

Because different levels of instruction require distinct training and skills, the Court believes that compliance with the *Brewer* standard must be measured according to the ratio prevailing at each level. A deviation of five percent, or a greater amount when caused by an imbalance of only one faculty member from that ratio, furthermore, would not violate the rule of approximate parity. The figures submitted show more substantial variations than this. East End middle school, with a 68% black student body has a 68% black faculty. Fairfield Court, Fairmount, Mason, and Woodville elementary schools at present are substantially all black; their faculties are 70%, 65%, 69%, and 67% black, respectively. Francis has a 98% white enrollment; Westhampton, 78%; and Westover Hills, 65%. Their faculties in a system with a 43% white elementary teaching staff, are 56% white, 50% white, and 50% white respectively. Some of these schools have such small staffs, to be sure, that a change in the racial composition of the faculty by a single teacher may result in a substantial percentage shift. The Court would disregard precedent, however, if it did not direct that in 1971–72 these deviations be cured, and that any further staff assignments giving rise to such deviations be submitted in the future to this Court for approval. Under the "freedom of choice" plan governing Richmond's schools through 1969–70, the faculties of many schools were plainly segregated. This fact, standing alone, contributed to the racial identifiability of schools, and in all probability it also impaired the process of student body desegregation by personal initiative. The experience of the results of faculty segregation requires that steps be taken to remove this possible and likely barrier as an impediment of majority to minority transfers, with the consequential fostering of resegregation. The law requires that the custom of faculty imbalance be terminated, if reasonably possible.

## TRANSPORTATION

 The means arranged for students to reach the schools to which they are assigned under plan 3 has not been worked out in detail. Unquestionably, although the Court's primary concern is to see that equal educational opportunities are afforded so far as possible in the schools run by the city defendants, the time and expense required to achieve that end are relevant issues. For the School Board, like the plaintiffs, is entitled to the exercise of the Court's practical equitable discretion; the effort required of it must be reasonably proportionate to its resources and its primary educational mission. The cost of desegregation, from the evidence presented, will be substantial, but not unreasonably so. In testing the reasonableness of various proposals we should not lose sight of the basic fact that in our society it is a primary mission of all governmental agencies to afford equal treatment regardless of race. When school authorities have not in the past done so, furthermore, it is part of their educational function to exercise their powers affirmatively to afford equal educational opportunity. The performance of these social obligations, whether it be directed by executive or legislative action or by judicial decree, will in many cases involve considerable time, effort and expense. Eliminating discrimination in the armed forces, in public employment, in welfare assistance programs, in public housing, and in the provision of municipal services has in the past and undoubtedly will in the future involve substantial cost. Yet the resolve has crystallized in more than one sector of government that such costs must be incurred in order to make governmental action conform to principles of fairness which have long subsisted in our society, standards which despite

their dishonor in the past can no longer be ignored. When government operations become more costly to serve these ends, in no sense can the additional expense be considered a waste or a diversion of funds from devotion to the chief goals. It is now too late in the day to deny that when public school authorities do not act consistently with the Constitution they fail to accomplish fully their primary educational task.

Richmond's Associate Superintendent, Dr. Thomas Little, stated on March 4, 1971, that under the current plan about 13,500 of the system's pupils travel to school by bus; 5385 are transported in "yellow buses" that the Board operates and another 8,000 to 8,500 are carried by public buses run by Virginia Transit Company (VTC). This is about 3,000 more pupils than would have used bus transportation, had the interim plan not been ordered into effect. Dr. Little is advised, furthermore, that VTC transportation facilities now are functioning at full capacity.

In 1971–72 about 1,377 residents of the newly annexed area will, pursuant to annexation plan, cease to attend Chesterfield County grades 1–6 and enter city schools. Cross-busing problems aside, these pupils can be taken to school using the extra capacity in the Board's present bus fleet.

Above the elementary level, under plans 2 and 3 the need arises, in the Board's judgment, to transport an additional 1,385 pupils assigned to Huguenot and Kennedy high schools and Mosby and Thompson-Westover middle schools. Because VTC capacity has reached its limit, Dr. Little said, these students will have to be served by additions to the "yellow bus" fleet. Relying on an average busload of 50 persons and assuming that each bus could carry two loads to and from school, Dr. Little figured that sixteen buses would be needed, of which two would be spares. Prices at $7,500 each, these would require a capital outlay of $120,000; yearly operating expenses are figured to be $25,000. No further transportation requirements accompany plan 2.

At the elementary school level under plan 3 the School Board decided that transportation must be afforded to all children in noncontiguously paired elementary schools during that half of their elementary career when they attend schools outside their zone of residence. The approximate number of children to be carried, by school and grade, has been established; the total is 7,269. Buses of the type which the Board thinks most suitable accommodate 66 elementary students; on that basis 108 busloads will have to be carried. Assuming that each bus can make only one trip to and from the noncontiguous zone, in addition to picking up students at home in certain areas, 77 further buses will be necessary:

| | |
|---|---|
| 7,269 students, at 66 per bus, one trip per bus: | 108 buses |
| Buses required to carry annexed area students from home to schools in zone of residence: | 25 buses |
| Spares: | 7 buses |
| Total fleet: | 140 buses |
| Less current fleet in regular use: | 63 buses |
| New acquisitions required: | 77 buses |

If it is possible to use each unit involved in crosstown transportation to carry two loads from a home area to school, 20 additional buses will meet the Board's needs:

| | |
|---|---|
| 7,269 students, at 66 per bus, two trips per bus: | 54 buses |
| Buses required to carry annexed area students from home to schools in zone of residence: | 25 buses |
| Spares: | 4 buses |
| Total fleet: | 83 buses |
| Less current fleet in regular use: | 63 buses |
| New acquisitions required: | 20 buses |

These are the upper and lower limits of the School Board's probable needs. Realistically speaking, Dr. Little stated that plan 3 of the elementary level could be carried out with a minimum of 40 additional buses, a $300,000 capital acquisition. Yearly operating costs would be $72,000.

Therefore under plan 3, Dr. Little gave as his best estimate, and the Court finds, that in the initial year $517,000 would be expended for transportation:

| | |
|---|---|
| Secondary level capital additions: 16 buses at $7,500 each | $120,000 |
| Elementary level capital additions: 40 buses at $7,500 each | 300,000 |
| Secondary level yearly operating cost: | 25,000 |
| Elementary level yearly operating cost: | 72,000 |
| | $517,000 |

Current plans do not include the provision of any transportation to contiguously paired schools. The operating cost estimates take into account reimbursement from the State Department of Education, as outlined in this Court's prior opinion, Bradley v. School Board of City of Richmond, supra, 317 F.Supp. 570.[5]

The School Board urges the adoption of plan 2, which includes the purchase of 16 additional buses, as satisfying their affirmative duty to make all reasonable efforts to desegregate the system. They have not attempted to show, however, that plan 3 would entail great operational obstacles. They have not said that transportation times would be so long as to be educationally detrimental, no more so at least than under the Foster plan which, it is settled, would satisfy the

defendants' duty. In fact Dr. Little said that the administration foresees practical advantages in operating its own transportation system over reliance on VTC. It would be more economical, would afford better control of pupil behavior, and would better enable the administrators to reduce delays.

Plan 2, however, cannot be approved under the law in this circuit for reasons already stated. Under the current interim plan, which involved the purchase of no additional buses by the School Board, up to 13,885 students are known to ride buses to school; omitted from this total are pupils who ride VTC but for some reason do not use the reduced-rate student tickets. Next year, under plan 2, another 1,377 elementary students would ride yellow buses to school pursuant to agreements made before the March, 1970, motion for further relief. Under plan 2 also, 1,385 secondary school pupils would take school buses across town to school under a proposal which the Board contends is entirely reasonable. This adds up to 16,647 pupil bus trips, out of an enrollment of 47,787. Plan 3 would necessitate the further transportation of 7,269 elementary pupils across town from zone to school. Each morning and afternoon, therefore, the buses of the School Board and VTC would make sufficient trips to carry 23,916 pupils from

5. For purposes of comparison, the Court notes that Dr. Foster estimated that if his desegregation plan were carried out 45 further buses would be required (tr. 619, June 22, 1970). He considered the 63 buses used by the Board in the annexed area to be available for use throughout the system, as well as eight other Board-owned buses, but he also did not take into account, apparently, the possible use of VTC facilities for busing across the James or to noncontiguously paired schools. VTC transports 8000–8500 under the interim plan. Dr. Foster estimated that his plan would necessitate the busing of 9431 elementary pupils to noncontiguously paired schools and 2900 high school and 2950 middle school students across the James River.

At the August, 1970, hearing, Dr. Little, Associate Superintendent, estimated that in order to desegregate the 19 schools left with enrollments of 90% or more once race under the interim plan, transportation of 8260 further elementary pupils would be required. Under the interim plan itself, he estimated that the 15,903 children living beyond one mile of school would need some form of transportation, and half would secure it by private means. Thus 7951 would ride VTC buses. 5000 more would be bused in the annexed area. To carry the 8260 elementary students, Dr. Little estimated 140 buses would be needed.

Mr. Church of VTC testified at the same hearing that his company had the capacity thought necessary to execute the interim plan, but that it would be impossible for it to serve another 4000 to 5000 students.

home to school or from school to school.[5a] Rather than transporting about 37% of its pupils to school, the proportion under plan 2, furthermore, Richmond would bus 43% of them under plan 3. This is a considerably lower proportion that the statewide figure of 60% of all public school children, a figure which does not even take into account children brought to school in general public transportation. The increment of 7,269, moreover, would all ride on buses for the operation of which the city system would in part be reimbursed by the state, under the scheme outlined in this Court's earlier opinion. Furthermore, although this factor is in no way dispositive of the reasonableness of these additional steps, it is significant that the city system has recently received $614,000 in federal grants to assist it in integrating the schools. Compared with the School Board's current yearly capital and operating budget of $60,000,000, this is not a huge amount, but it is more than enough to cover the capital and operating costs of transportation under plan 2 and plan 3.

Busing programs in effect in adjoining counties indicate than plan 3 would not involve a striking departure from usual practice in the area. In 1968–69 Chesterfield County transported to school 15,623 elementary and 7,606 secondary pupils; Henrico County bused 12,673 elementary and 9,272 secondary pupils. Each county system serves about 10,000 fewer students than does the city.

In Virginia in 1968–69, 598,773 students rode yellow buses to school; nationwide the figure was 18,467,944. There is no discernible tendency among educators to disapprove the busing of children of the lowest age level attending public schools. Depending of course on the environment in question, busing may be the safest way to get to school regardless of distance.

At the same time, research indicates that the earlier a child is educated in a desegregated milieu, the greater the eventual overall benefits to him in the form of achievement level and social adjustment. Racial isolation in the Richmond public schools has been accompanied by a considerable disparity in achievement levels; students in all black schools lag behind their counterparts in white schools. Each year that segregation is maintained imposes an undeniable cost in educational benefits on black students, on whites as well, and on the City of Richmond, which is denied a fully productive citizenry. This cost has not been calculated in dollars, but were it done, even roughly, the Court would be surprised if it did not far outweigh the expense of desegregation.

Times in transit have not been computed for plan 3, but evidence taken with reference to the Foster plan indicates that no inordinate delays would be involved. Dr. Foster's proposal, of course, used a different pairing structure, but travel times established in the evidence between the same or nearby schools under his plan establish a fair basis for estimating the travel times required under plan 3. The greatest distance traveled under the Foster plan was 12 miles between the Fisher and Baker schools; this trip takes an estimated 50 minutes at 8:00 a.m. Under plan 3, Fisher is paired with the somewhat closer Carver school, and the time may be expected to decrease. Francis and Fairmount are paired under

---

5a. Figures giving the number of daily bus trips under various plans illustrate the effort and investment necessary. Because, however, about half of the pupils in the annexed area (some 2,961 elementary pupils and an undisclosed number of secondary pupils) are carried from home to school in the annexed area and thereafter across town to the assigned school, the number of persons transported daily under plan 3 is less than 23,916. A fair estimate of the actual number carried is 20,535:

| | |
|---|---:|
| Pupils on VTC buses: | 8,500 |
| New secondary busing: | 1,385 |
| New elementary busing: | 7,269 |
| Annexed area busing, home to school only (half of 5,385 plus 1,377) | 3,381 |
| | 20,535 |

both plans, and the travel time is fixed at 38 minutes; the time between Broad Rock and Whitcomb Court under plan 3 will be approximately the same. The trip from Westhampton to Fairfield Court is estimated to take 35 minutes under the Foster plan. Westhampton is paired with Norrell under plan 3, which is closer, and the trip should take less time. Munford is paired with Highland Park under plan 3; the travel time should approximate the 35 minutes between Westhampton and Fairfield Court. Baker, paired with Southampton under plan 3, is closer to the latter than was Mosby, Dr. Foster's choice, and can be expected to be closer in travel time than the 40 minute trip that was calculated between Southampton and Mosby.

Summer Hill and Ruffin Road are paired with Chimborazo under either proposal; the trip takes 30 minutes. To link Greene and Fairfield Court under plan 3 should take no longer than the 38 minutes required to go between Fairmount and Francis. To cover the distance between Reid and the Bellevue, Mason and Bowler area under plan 3, it should require an interval similar to that between Bellevue and Broad Rock under the Foster plan, which has been found to be 33 minutes. The Redd-Woodville distance should not require appreciably more time than the 38 minutes between Francis and Fairmount.

At the secondary level, additional transportation proposed by the School Board is not unreasonable. The exchange of attendance areas between Bainbridge and Elkhardt middle schools will involve exclusively transportation south of the river save for a small extension of the Bainbridge zone across into the near east end. Time in transit from that point should be substantially less than the 30 minutes calculated between the Mason and Oak Grove elementary sites. Mosby middle school's zone in the west end is expanded south of the James. It was computed that the trip from Southampton, in the far west end of the new zone, to Mosby takes 40 minutes. The other major middle school change, to expand the Thompson zone, in south Richmond, involves transportation only in the noncongested outer annexed area. Transportation time from the northern satellite zone to Thompson or Westover should compare with that measured from Amelia-Maymont to Reid, or 40 minutes.

New high school transportation is confined to that from a new eastern satellite zone for Huguenot and an expansion of a Kennedy satellite zone to include an area south of the river on the west end. To estimate travel time between these two schools and the new zones, the established travel times between Mosby and Southampton, 40 minutes, and Fisher and Baker, 50 minutes, provide fair guidance. The trip from each new zone to school should fall somewhere between those figures.

These times are not unreasonably long for school children of any age. As a general rule school administrators try to adhere to a maximum transportation time of no more than one hour each way; these figures fall below that.[6]

Given the will to do so, there are in Richmond no black or white residential areas so large that the children therein cannot be afforded a desegregated education throughout their school careers, including the most important early years, by the use of conventional and accepted educational tools. Moreover, if noncontiguous pairing coupled with transportation is to be used at all, there is no sensible basis on which it can be limited in operation so that less than all the schools are desegregated. The travel times required nearly all range between about 30 and 40 minutes; variations are so insub-

---

6. Bradley v. School Board of City of Richmond, *supra*, 317 F.Supp., pp. 569–572; see also, p. 650 of Vol. 3 of transcript of hearing held June 22, 1970. In 1968–69 the statewide average per bus was 62 minutes from beginning of run to school. The average miles per bus per day was in excess of 40 and ranged from 18 to 90 miles.

stantial that, for instance, it cannot be said reasonable to desegregate Chimborazo by means of a 30 minute bus trip and yet abusive of equity powers to desegregate Fisher, if the trip requires 50 minutes.[7]

During the 1970-71 school year, the School Board allowed majority to minority transfers, with transportation costs met by the Board, and notified all parents of this option. 73 students exercised this right, 15 whites and 58 blacks. Although insufficient standing alone to desegregate schools, such a transfer plan can be valuable in allowing personal initiative to assist the School Board in its task of ending racially exclusive schools. This program should continue. Notice of the option should be given all students at least as soon as they appear at their assigned schools, together with the offer of paid transportation. Transfers should not be barred for lack of space except by specific approval of this Court. Brewer v. School Board of City of Norfolk, supra; Allen v. Board of Public Instruction of Broward County, 432 F.2d 362, 365 (5th Cir. 1970); Hightower v. West, 430 F.2d 552, 558 (5th Cir. 1970); Clark v. Board of Education of Little Rock School District, 426 F.2d 1035, 1044 (8th Cir. 1970); Ellis v. Board of Public Instruction of Orange County, 423 F.2d 203, 206 (5th Cir. 1970).

Furthermore, the Court is concerned over the equities and the law involved in imposing the costs of transportation to achieve desegregation upon some but not all individual students. Cf. Hawkins v. Town of Shaw, Mississippi, 437 F.2d 1286 (5th Cir. 1971). To be sure some students in cities all over the country pay their bus fare to school, just as they absorb some other charges necessary to take advantage of "free" public schooling. Here in Richmond it has been necessary for at least 8,000 to 8,500 to pay, albeit at a reduced rate, to ride VTC buses to school. During 1970-71 this Court directed the School Board to relieve chil-

dren living beyond one mile from school and meeting the indigency criteria for participation in Office of Economic Opportunity programs of the burden of bus fare. Counsel were invited in August to submit further memoranda on the question of the Board's possible duty so to aid all students, but none have responded. Evidence at the March, 1971, hearings indicated that Richmond is at present paying in the bus fare of about 2,392 indigent students.

Because the burden of affording a desegregated education is not the pupils' but that of the defendants, the Court is impelled to direct the submission of further data. The defendants will be asked to inform the Court of the number of students whose school assignment under plan 3 necessitates their traveling to school, first, more than that distance which, under Virginia law, they may be compelled to walk to school; and, second, more than one mile (see Tr. June 25, 1970, p. 1100 and Tr. Aug. 7, 1970, p. 267), and for whom free transportation by school bus or common carrier would not be provided. The defendants should also give the Court their best estimate of the number of such children who will use buses rather than private means to and from school and the probable yearly cost to the School Board if it, rather than its pupils, must finance such transportation on VTC buses or otherwise. Passing the question whether the state statute, Va. Code § 22-275.3 (1969 Repl.Vol.) is constitutional in effectively denying the benefit of free bus transportation to pupils to whom public transportation is accessible, either on its face or as applied in Richmond, cf. Sparrow v. Gill, 304 F. Supp. 86 (M.D.N.C.1969), it may be inequitable for this Court to direct the adoption of a desegregation plan that "works" only because those of a race heretofore excluded from a certain school are made to pay for access to it, whereas many students of the other race continue to attend the facility at no cost by

---

7. Most of the foregoing findings in regard to the reasonableness of the contemplated transportation were covered in the Court's memorandum of August 17, 1970.

reason of their proximity. The Court will not settle the question on the present record, for further data both as to numbers of students involved and costs will bear on the reasonableness of possible decrees, and the issue is not yet urgent; however, defendants are specifically referred to the Court's previous conclusions in reference to the reasonableness of expenditures based on defendants' "most exaggerated estimates both for capital outlay and operating costs" as set out in *Bradley, supra,* 317 F.Supp. p. 572.

## THE FOSTER PLAN

The law establishing what is and what is not a unitary school system lacks the precision which men like to think imbues other fields of law; perhaps much of the public reluctance to accept desegregation rulings is attributable to this indefiniteness. Not only do the means required to integrate vary from one area to the next, but also the end in sight—something called "just a school;" not racially identified—varies. Courts have said that the duty to integrate is fulfilled in some cases when systemwide parity is met in each school, Allen v. Asheville City Board of Education, *supra,* and that in some other circumstances uniracial schools may exist in a unitary system, Swann v. Charlotte-Mecklenburg Board of Education, *supra.* Perhaps beyond a certain point, a school board's efforts to desegregate all schools are not a matter of constitutional imperative. Yet unitary nature, both before that point and beyond it, is a characteristic which a system may possess in varying degrees. Up to the point at least that all reasonable efforts have been expended, the heavy burden is on the board to justify its choice of a plan that results in a "less unitary" system of schools. Green v. County School Board of New Kent County, *supra,* 391 U.S. 439, 88 S.Ct. 1689. It is according to this standard that the Court must consider the School Board's rejection of the Foster plan in preference to its own plan 3. Because upon examination the

Court cannot find that the Foster plan would result in a "more unitary" system at any level, the adoption of plan 3 can be approved.

Dr. Foster's proposal was by its own terms a one year plan for 1970–71. At the Court's request the School Board has calculated the results attainable under Dr. Foster's zoning and cross-bussing system if used during 1971–72. Racial composition projections under that plan and plan 3 compare as follows:

| School | Foster Plan | | Plan 3 | |
|---|---|---|---|---|
| | White % | Black % | White % | Black % |
| **High Schools:** | | | | |
| Armstrong | 23 | 77 | 30 | 70 |
| Huguenot | 68 | 32 | 57 | 43 |
| Jefferson | 48 | 52 | 41 | 59 |
| Kennedy | 9 | 91 | 25 | 75 |
| Marshall | 17 | 83 | 21 | 79 |
| Walker | 28 | 72 | 26 | 74 |
| Wythe | 55 | 45 | 43 | 57 |
| Totals: | 36 | 64 | 35 | 65 |
| **Middle or Junior High Schools:** | | | | |
| Bainbridge | 21 | 79 | 43 | 57 |
| Binford | 23 | 77 | 23 | 77 |
| * Blackwell | 48 | 52 | 20 | 80 |
| Chandler | 32 | 68 | 19 | 81 |
| East End | 25 | 75 | 30 | 70 |
| Elkhardt | 49 | 51 | 54 | 46 |
| Graves | 46 | 54 | 30 | 70 |
| Hill | 34 | 66 | 23 | 77 |
| Mosby | 26 | 74 | 25 | 75 |
| Thompson | 31 | 69 | 61 | 39 |
| Totals: | 33 | 67 | 35 | 65 |

* Used as an elementary school under plan 3.

Elementary Schools:

(Under plan 3, figures given for paired schools represent overall ratio in pair)

| School | White % | Black % | White % | Black % |
|---|---|---|---|---|
| Amelia-Maymont | 36 | 64 | 24 | 76 |
| * Bacon | 27 | 73 | 70 | 30 |
| Baker | 37 | 63 | 40 | 60 |
| Bellemeade | 38 | 62 | 66 | 34 |
| Bellevue | 57 | 43 | 36 | 64 |
| Blackwell | 18 | 82 | 20 | 80 |
| Bowler | 37 | 63 | 36 | 64 |
| Broad Rock | 61 | 39 | 39 | 61 |
| Brook Hill | 28 | 72 | 28 | 72 |

* Used as a middle school under plan 3.

NOTE—In plan 3, Middle schools, Bainbridge is consolidated with Maury, Chandler with Norrell Annex, and East End with Bacon and Old Chimborazo, and Thompson is paired with Westover.

| School | Foster Plan White % | Black % | Plan 3 White % | Black % |
|---|---|---|---|---|
| Carver | 33 | 67 | 46 | 64 |
| Chimborazo | 44 | 56 | 39 | 61 |
| Clark Springs | 40 | 60 | 36 | 64 |
| Davis | 42 | 58 | 46 | 54 |
| Fairfield Court | 29 | 71 | 47 | 53 |
| Fairmount | 34 | 66 | 46 | 54 |
| Fisher | 21 | 79 | 46 | 54 |
| Fox | 25 | 75 | 35 | 65 |
| Francis | 30 | 70 | 46 | 54 |
| Franklin | 44 | 56 | 55 | 45 |
| Fulton | 42 | 58 | 46 | 54 |
| Ginter Park | 32 | 68 | 28 | 72 |
| Greene | 48 | 52 | 47 | 53 |
| Henry | 46 | 54 | 55 | 45 |
| Highland Park | 12 | 88 | 33 | 67 |
| Lee | 41 | 59 | 24 | 76 |
| Mason | 30 | 70 | 36 | 64 |
| * Maury | 25 | 75 | 43 | 57 |
| Munford | 41 | 59 | 33 | 67 |
| Norrell | 24 | 76 | 29 | 71 |
| Oak Grove | 28 | 72 | 66 | 34 |
| Redd | 45 | 55 | 40 | 60 |
| Reid | 53 | 47 | 36 | 64 |
| Scott | 25 | 75 | 28 | 72 |
| Southampton | 48 | 52 | 40 | 60 |
| Stuart | 25 | 75 | 28 | 72 |
| Summer Hill-Ruffin Rd. | 40 | 60 | 39 | 61 |
| West End | 37 | 63 | 35 | 65 |
| Westhampton | 27 | 73 | 29 | 71 |
| * Westover Hills | 37 | 63 | 61 | 39 |
| Whitcomb Court | 30 | 70 | 39 | 61 |
| Woodville | 43 | 57 | 40 | 60 |
| Totals: | | | 39 | 61 |

* Used as a middle school under plan 3.

It is instantly apparent that plan 3 is preferable on the high school level. Whereas under the plaintiffs' proposal the ratio of whites to blacks ranges from 17%–83% to 68%–32%, under plan 3 it falls between 21%–79% and 57%–43%, a narrower spread.

Dr. Foster's middle school plan includes no majority white schools; the defendants' plan 3 includes two. Yet in the Court's opinion there is little to choose between the plans from the standpoint of desegregation, and the plaintiffs' own plan admittedly has shortcomings from other educational standpoints. Dr. Foster's plan proposes three schools between 46% and 49% white; it is difficult to say that, under plan 3 Elkhardt, 54% white, presents a materially greater danger of resegregation. Thompson, 61% white, probably does so, although even there the deviation from par is not great, and only time will truly tell. Still, rather than three schools about half white, plan 3 provides only two; the Court cannot say that either is "more unitary" than the other.

Furthermore, Dr. Foster himself indicated a preference for some arrangement other than one grade junior high schools, of which his plan included nine. Educational benefits and school loyalty would be raised, he said. The defendants have elected to operate primarily three-grade middle schools under plan 3. Only two schools at most will serve a single grade: Hill and Westover. Consolidated schools at other sites, Bainbridge and Maury; East End, Bacon, and Old Chimborazo; and Chandler and Norrell Annex, are in sufficient proximity to operate as single three-grade facilities. Elkhardt, Graves, and Mosby all contain grades six through eight. Multigrade schools have administrative benefits and educational ones as well, according to Dr. Foster. Fewer students, under plan 3, will be compelled to move to a new school environment, with different teachers and administrators, once or even twice in their middle school careers. Perceived advantages are likely to engender school loyalty among students and parents, which in turn will contribute to the system's stability. These considerations justify the School Board's preference for plan 3.

At the elementary level, plan 3 and the Foster plan achieve similar results. Plan 3, as heretofore noted, contemplates four majority white schools; the Foster proposal includes three. Three schools will be 75% or more black under plan 3; under the plaintiffs' plan there would be eight, and two of these would be over 80% black, whereas plan 3 incorporates only one 80% black elementary school. Ten schools under the Foster plan would be at least 70% black; plan 3 provides for nine. Dr. Foster's plan places a 12% white minority in Highland Park school; based on the evidence of rapid demographic change in that area, the Court believes that a high risk of resegregation of that school exists. No threat of such

magnitude exists under plan 3. Although operation under either plan would fulfill the School Board's legal duty, it would be fully justified in preferring plan 3 on the basis of whatever administrative or educational reasons it finds persuasive.

## PREPARATION FOR DESEGREGATION

The day is past when courts held that available injunctive relief did not encompass orders specifying the manner in which state officials might collect or disburse public funds. When taxing or spending powers have been used in such a manner as to infringe upon constitutional guaranties, and in cases when the exercise of such authority pursuant to judicial order is a form of relief "necessary to prevent further racial discrimination," Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964), a federal court may govern by decree the discretion of state officers over the levying and diversion of public funds. Griffin v. County School Board of Prince Edward County, supra; Harkless v. Sweeny Independent School District, 427 F.2d 319 (5th Cir. 1970); Plaquemines Parish School Board v. United States, 415 F.2d 817 (5th Cir. 1969); Hosier v. Evans, 314 F.Supp. 316 (D.V.I.1970); United States v. School District 151 of Cook County, 301 F.Supp. 201 (D.C. 1969); Pettaway v. County School Board of Surry County, 230 F.Supp. 480 (E.D. Va.1964); see also Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 238–240, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); Jones v. Alfred H. Mayer Co., 392 U.S. 409, 414–415 n. 14, 88 S.Ct. 2186, 20 L. Ed.2d 1189 (1968); J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Louisiana v. United States, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946):

> [W]here federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief. Bell v. Hood, supra, 684, 66 S.Ct. 777.

The violation of the constitutional rights of thousands of school children has been made out in the evidence. Although the entire effects of past illegal discrimination are beyond any court's power to alleviate, officials of the City of Richmond at least have made plans in order, to the extent feasible within their powers, to prevent further injury. In view of the defendants' demonstrated reluctance even now to provide the plaintiff class the full measure of their legal rights, an injunctive order requiring them to execute those plans promptly and effectively is entirely appropriate.

An order shall enter directing the School Board and City Council of the City of Richmond and the City itself and all others acting in concert with them forthwith to commence "all necessary clerical and administrative steps—such as determining new student assignments, bus routes and athletic schedules and preparing for any necessary physical changes—preparatory to complete conversion," Carter v. West Feliciana Parish School Board, 396 U.S. 226, 227, 90 S.Ct. 467, 468, 24 L.Ed.2d 382 (1969), under plan 3, such preparation to be completed in sufficient time to operate the city schools under that plan commencing the 1971–72 school year, and directing the same defendants "to take no steps which are inconsistent with, or which will tend to prejudice or delay," Id., 228, 90 S.Ct. 469, such preparation and operation.

## SUMMARY

Based on the foregoing findings, as well as those clearly enunciated in the Court's memorandum of August 17, 1970, the Court will direct the Richmond defendants to commence forthwith preparations for the operation of city schools under plan 3 and to operate the schools under that plan, unless ordered otherwise, during the 1971–72 school year. However, because the form of relief now decreed is based on fact findings which in

reality amount to predictions, the Court will state now that its approval of this proposal is conditioned upon its operating as planned. If the attendance projections are not reflected in actual enrollments, the Court will not hesitate to direct revisions in school assignments in order to preserve the anticipated desegregation of the system. To avoid needless disruption, it may be that the School Board will desire to provide for early registration of students so that any gross departures from the predictions may be detected and steps taken to cure them. In any event the School Board will be ordered to submit attendance figures for each facility as soon as possible after the first registration and at two week intervals thereafter until further order of this Court. The Constitution is satisfied only when an integration plan "works" in practice and not merely on paper. Brooks v. County School Board of Arlington County, 324 F.2d 303 (4th Cir. 1963).

The decree shall also oblige those defendants to acquire by purchase, lease, or other contract those transportation facilities which are necessary in the judgment of the School Board to implement the student assignments ordered under plan 3. The evidence before the Court at this point is that a minimum of 56 buses will be needed. Further studies of routes and travel times, attempts to devise feasible schedules for study and extracurricular activities, and consideration of safety and disciplinary problems may persuade the School Board that they must have more than that number. If so, to ensure the successful operation of plan 3 it is their duty to acquire them. The order shall require them, so far as necessary to this end, to divert funds budgeted for other uses.

At the same time all parties are cautioned that the operation of city schools free from racial bars may not be cause for a reduction in educational quality or the discontinuance of courses, services, programs, or extracurricular activities traditionally offered. Plaquemines Parish School Board v. United States, *supra*; United States v. Georgia, Civil Action No. 12972, mem. order (N.D.Ga. Jan. 13, 1971).

Those defendants who have such power will be directed, respectively, to request and to raise and appropriate all funds requisite for the operation of the city school system in full compliance with the terms of this memorandum.

An appropriate order will enter.